### COFFIN v. ANDERSON.

The *gist* of the action of trover is the *conversion of the plaintiff's goods;* and no special plea in bar of the action can be good, unless it confess and avoid the conversion.

A plea in trover for bank-notes, that the defendant as cashier of a bank received them in bank from the holder, on special deposite, is bad.

If the plaintiff's interest in the goods for which trover is brought be not sufficient to sustain the suit, the proper plea is not guilty.

If a witness be impeached by proof of his having previously made statements inconsistent with his testimony, he may be corroborated by evidence of other statements made by him in accordance with his testimony. *Aliter*, if he has not been thus impeached.

Nov. Term,
1837.

COFFIN
v.
ANDERSON.

A notice to take depositions may be served on the attorney; and the service may be proved by his written acknowledgment.

The receiving of bank-notes in a bank on special deposite, is as much a bank transaction as the receiving of them on general deposite; but the nature of these two kinds of deposites is very different.

When bank-notes are received in bank on general deposite, they become the property of the bank, and their amount is a debt payable on demand by the bank to the person entitled to it. If payment in such case be afterwards refused, the creditor's only remedy is an action of *debt* or *assumpsit* against the bank.

But if the deposite of the notes be special, there is no change of property, and the deposite is nothing but a bailment. The conversion of such a deposite by the cashier is a *tortious* act, for which he is individually liable in an action of *trover*.

If a person refuse to deliver goods in his possession to the owner, saying that they belong to another, such refusal is evidence of a conversion.

Trover for bank-notes cannot be sustained for want of property in the plaintiff, if it appear that he had obtained the notes by means of a forgery committed by himself or with his knowledge; and the forgery, &c. may be proved by circumstantial evidence.

Where bank-notes have been obtained from the owner by means of a forgery, and have been received by a third person *bona fide*, for value, and without notice, the claim of such third person, if he was guilty of gross negligence in taking the notes, must yield to that of the original owner.

The *bona fide* possession of goods gives a sufficient property to the possessor, to enable him to maintain an action of trover for them against a wrong-doer.

*A.* obtained certain bank-notes from a bank by means of a forgery, and afterwards exchanged them with another bank and with individuals for other bank-notes. *Held,* that the bank imposed on by the forgery, was entitled to the last-mentioned bank-notes, which were in *A.'s* possession and had been received by him as aforesaid, as its property.

Saturday,
December 2.

ERROR to the *Wayne* Circuit Court.

BLACKFORD, J.—This was an action of trover brought by *Anderson* against *Coffin.* The declaration charges the defendant with converting, to his own use, certain bank-notes belonging to the plaintiff of the value of 6,000 dollars. The defendant pleaded the general issue, and also the following three special pleas: *First,* That the defendant, as cashier of the *Richmond* branch bank, received the notes into the bank, on special deposite, from one *Samuel W. Forsha,* the holder of the notes. *Secondly,* That the notes were the property of the *Richmond* branch bank, of which the defendant was cashier; and that the defendant retained the notes in the bank for its use. *Thirdly,* That the notes were the property of the Bank of Massillon, in the state of *Ohio;* and that the defendant, as cashier of the *Richmond* branch bank, received the notes on

Nov. Term,
1837.

COFFIN
v.
ANDERSON.

deposite from one *Samuel W. Forsha*, to be kept for the Bank of Massillon. The special pleas were all demurred to specially, on the ground that they amount to the general issue; and the demurrers were sustained. The parties went to trial on the general issue; and the plaintiff obtained a verdict and judgment for the sum of 3,398 dollars.

The first special plea is bad. The declaration charges the defendant with wrongfully converting, to his own use, certain bank-notes, the property of the plaintiff. The plea attempts to answer the charge by saying that the defendant, as cashier of a certain bank, received the notes into the bank, on special deposite, from the holder of them. But this is no answer to the charge. The *gist* of the action of trover is the *conversion of the plaintiff's goods;* and no special plea in bar of the action can be good, unless it confess and avoid the conversion. The plea before us has reference merely to the manner in which the notes came into the defendant's hands, which is entirely an immaterial matter. It is obvious that the conversion of the notes as charged, is not answered by an averment that they were received into the bank by the defendant on special deposite. Such a plea does not go to the point of the action, which is the conversion. If the defendant had had nothing more to do with the notes than merely to receive them into the bank on deposite, he had committed no conversion of them; and, in that case, his proper plea was not guilty. It has been decided, that a special plea, relying on a lawful detainer of goods on account of a lien, or for salvage, or for a distress, is not good in an action of trover. The reason is, that the plea does not admit and avoid the *conversion*, for which alone the suit is brought. *Hartfort* v. *Jones*, 1 L. Raym. 393.—*Agar* v. *Lisle*, Hobart, 187.—Gould on Pl. 3. And if such pleas, showing the goods to be lawfully detained for a special purpose, are not admissible, *a fortiori*, the plea now in question, which shows merely a lawful receipt of the goods, is not a proper answer to the suit. The only legitimate plea, in any of these cases, is the general issue.

The second and third special pleas are only an indirect denial of the plaintiff's property in the notes. The second avers that the notes belonged to the *Richmond* branch bank; and the third, that they belonged to the Bank of Massillon. The defence contained in these pleas, assuming it to be a good

bar to the suit, should have been taken advantage of under the general issue. The pleas are only a denial, in an argumentative form, of the alleged conversion of the plaintiff's goods. If the plaintiff had not such an interest in the property as would authorise him to sue in trover, the defendant's proper plea was not guilty. The law is so stated in *Lynner* v. *Wood*, Cro. Car. 157, in Gould on Pleading, 346, and by Ld. Kenyon in *Webb* v. *Fox*, 7 T. R. 387.

We are therefore of opinion, that the demurrers to the special pleas were correctly sustained.

On the trial of the cause, the defendant filed several bills of exceptions.

The first bill shows the following facts:—The defendant proved by *Forsha*, one of the witnesses, that the plaintiff, on his being arrested on a charge of having obtained the notes in question from the *Massillon* bank by means of a forgery, exclaimed that he had no *Massillon* money. The plaintiff, then, in order to impeach *Forsha's* testimony, proved by some of the defendant's witnesses, on their cross-examination, that they had heard *Forsha* previously relate the circumstances of the arrest, without his mentioning that the plaintiff had exclaimed at the time, that "he had no *Massillon* money." The defendant, in reply to this evidence impeaching *Forsha's* testimony, offered to prove that *Forsha* had related the facts to others as he had now detailed them. This evidence in reply, thus offered by the defendant, was objected to by the plaintiff, and the objection was sustained.

If the testimony in question, which the defendant proposed to introduce in order to corroborate *Forsha's* evidence, had been offered in the first instance, before the evidence given by *Forsha* had been impeached, we should have considered it to be inadmissible. There are, indeed, authorities for the admissibility of the evidence, although the witness had not been impeached. *Lutterell* v. *Reynell*, 1 Mod. Rep. 283.— Gilbert's Ev. 150.—2 Hawk. Pl. Cr. 431. But that point has been decided otherwise, and we think correctly. *The King* v. *Parker*, 3 Dougl. 242.—Buller's N. P. 294.—*Jackson* v. *Etz*, 5 Cowen, 314. If the witness has not been impeached, by proof of his having previously made statements inconsistent with his testimony, there seems to us to be no sufficient reason for the introduction of the corroborating evidence. But it is

otherwise, if the witness has been thus impeached: it appears then to be proper to give the party who called the witness an opportunity to support him, by proving that the witness had, on other occasions, stated the facts to be as he represents them in his testimony. There are several cases directly in favour of the admission, under these circumstances, of this corroborating evidence. *Cooke* v. *Curtis*, 6 Harr. & Johns. 93.—*Lessee of Packer* v. *Gonsalus*, 1 Serg. & Rawle, 536, by Tilghman, C. Jus.—*Lessee of Wright* v. *Deklyne*, 1 Peters' Cir. Court Rep. 203.—*The People* v. *Vane*, 12 Wend. 78. It is true, that it is said by Mr. *Starkie*, that the better opinion is the other way. 1 Starkie on Ev. 187. But the *English* authorities are contradictory, and the weight of the *American* cases is decidedly in favour of admitting the evidence.

We consider, therefore, that the Circuit Court erred in rejecting the testimony.

The second bill of exceptions shows, that the deposition of *James Rockwell*, the teller of the Commercial Bank of Lake Erie, was offered in evidence by the defendant, but was rejected. The only ground of objection to the admission of this deposition is, that there was no legal notice of taking it. The evidence relative to the notice is as follows:—The written acknowledgment of *Griswold* and *Grant* as attorneys of the plaintiff, that they had received due notice of the taking of the deposition, was produced. It was proved that those gentlemen were attorneys at law, and resident in the same town in the state of *Ohio* with the plaintiff; that they had assisted him as his attorneys—he being present—in taking several of the depositions in the cause; and that they had defended him, a short time before, as his attorneys in a criminal prosecution in *Ohio*, relative to the forgery with which this cause is connected. These facts are sufficient, in the absence of any rebutting testimony, to show that the gentlemen who made the acknowledgment in question, were the attorneys in the cause for the plaintiff. That being so, and as the statute authorises the notice to be served on the attorney, it follows that the present acknowledgment of service is good. The deposition under consideration ought, therefore, to have been admitted.

The third bill of exceptions sets out the evidence, and shows that certain instructions to the jury were asked for by the de-

fendant and refused; and that certain other instructions were given by the Court, to which the defendant excepted. The facts proved, as shown by this bill of exceptions, are substantially as follows:—

On the 25th of *May*, 1836, *John Mendenhall* deposited to his own credit 400 dollars in the Commercial Bank of New-Lisbon in *Ohio*, and took a certificate of the deposite. On the same day, he indorsed the certificate to *Cyrus* and *George Mendenhall*, enclosed it in a letter directed to *Cyrus Mendenhall* at *Cleveland*, *Ohio*, and put the letter into the post-office at *New-Lisbon.*

On the 6th of *June*, 1836, a man calling himself *George Stevens*, presented a letter of introduction to one *Thomas Blackburn* at *Massillon, Ohio,* dated the first of *June*, 1836, and signed *Jacob Roller*, requesting *Blackburn* to assist *Stevens*, the bearer of the letter, in obtaining land-office money for a certificate of deposite given by the *New-Lisbon* bank. *Blackburn*, on the same day, introduced the bearer of the letter to the cashier of the Bank of Massillon; and, on the next day, the same man, calling himself *Stevens*, obtained from the last-named bank, payment for the certificate of deposite given by the *New-Lisbon* bank; which certificate appeared to be for the payment of 7,400 dollars. This certificate was payable to the order of *John Mendenhall*, indorsed by him to *Cyrus* and *George Mendenhall*, and appeared to be indorsed by them to *George Stevens.*

The payment was made by the *Massillon* bank to the person calling himself *Stevens*, as follows, viz. by notes of that bank for 4,000 dollars, and by a certificate of deposite given by the same bank for 3,400 dollars. The certificate of deposite, thus given by the *Massillon* bank, was afterwards, by the Commercial Bank of Lake Erie at *Cleveland*, paid to the person calling himself *Stevens*, and was sent back to the *Massillon* bank, and the amount was there credited to the Commercial Bank of Lake Erie. The payment of the 4,000 dollars, which was made by the *Massillon* bank in its own notes, was in notes of the following description:—1,000 dollars in notes of 100 dollars each; 1,000 dollars in notes of 50 dollars each; 1,500 dollars in notes of 20 dollars each; and the balance in 10 dollar notes. The teller of the bank, in order that the

notes might be known when they returned, put a private mark on all of them, except those of 10 dollars. That mark was the letter *S* in red ink.

The *Massillon* bank, in two or three days after this transaction, discovered that the certificate on the *New-Lisbon* bank had been feloniously altered from 400 to 7,400 dollars; and immediate notice of the fraud was given by the *Massillon* bank to the public, by means of printed bills; and a reward of 500 dollars was offered for the apprehension of the offender. The suspicions of the bank, as to the perpetration of the forgery, were very soon fixed on *James Anderson*, the plaintiff in the present suit, who resided at *Canton*, which is eight miles from *Massillon*, 35 miles from *New-Lisbon*, and 60 miles from *Cleveland*.

On the 11th of *June*, 1836, the fourth day after the fraudulent receipt of the notes from the *Massillon* bank, *Anderson* left *Canton* in a stage-coach for the west, and was pursued the next day by *Brown*, the agent of the *Massillon* bank. *Anderson* changed his name on the way, by calling himself *Andrews*, and was observed as he passed westwardly through *Ohio*, to have a large amount of notes, apparently new, on the *Massillon* bank, which were of the same description, and had the same private mark, as the notes paid by that bank on the forged certificate. He had also with him a large amount of notes on the Commercial Bank of Lake Erie; and he exchanged on the route several of the *Massillon* bank-notes, having the private mark on them, for the notes of other banks,—showing a great anxiety to do so. On the 16th of *June*, 1836, *Anderson* exchanged, at the *Richmond* branch of the State Bank of Indiana, 2,270 dollars of *Massillon* bank-notes, having the private mark on them,—some of which were 100, some 50, and some 20 dollar notes. For these notes, *Anderson* received, from the *Richmond* branch bank, notes on the State Bank of Indiana. *Brown*, the agent of the *Massillon* bank, overtook *Anderson* at *Richmond*, in this state, on the 16th of *June*, 1836; and on the night of that day, just as *Anderson* was about to set out in the western stage from *Richmond*, where he had called himself by a different name, *Brown* caused him to be arrested for the fraud committed on the *Massillon* bank.

51

*Forsha*, the officer who made the arrest, took from *Anderson's* possession 5,108 dollars in bank-notes. Of these notes, 1,710 dollars were on the Commercial Bank of Lake Erie and were new; 2,375 dollars were on the State Bank of Indiana; and the others were on various other western banks. These notes, thus taken from *Anderson*, were immediately placed by *Forsha* in the *Richmond* branch bank on special deposite; the defendant who received them on deposite being the cashier of that bank, and knowing, at the time, the circumstances under which *Forsha* had obtained them. The receipt of the defendant as cashier, which was given for this deposite, states that the packet of notes so deposited was to be delivered to the order of *Forsha*, on the final determination of a controversy then pending between the attorneys of the Bank of Massillon and *Anderson*.

After the notes were so delivered to the defendant, and before the present suit was commenced, the plaintiff demanded the notes of the defendant, and the defendant refused to deliver them,—alleging that the plaintiff had not come fairly by them, and that they belonged to the *Massillon* bank.

There was proof that the letter, introducing the person calling himself *Stevens* to *Blackburn*, was a forgery and in the plaintiff's hand-writing; that the plaintiff, after his arrest, had made contradictory statements as to how and where he had received the *Massillon* bank-notes,—telling *Brown*, the agent of the bank, that he had received the notes from a stranger on a steam-boat in exchange for others, and telling the officer who arrested him, that he had received them at *Canton* from a stranger whom he would not again know. There were also some other circumstances of suspicion proved against the plaintiff. There was evidence that *Forsha* had, since this action was commenced, assigned to the *Massillon* bank the certificate of deposite given to him by the defendant; and that the defendant is secured by that bank against any damages which he may sustain by this suit.

These are the material facts connected with the cause, and which are necessary to be known in order to form an opinion on the questions raised by the third bill of exceptions. We shall not extend this opinion by an examination of the numerous instructions which were asked for by the defendant, and

which the Court refused to give. All that is necessary for a correct understanding of this part of the cause is, to examine the propriety of the instructions which were given by the Court, and to which the defendant objected.

The Court, in the first of these instructions, stated that one ground of the defence was, that the defendant was the cashier of the *Richmond* branch bank; that he received the money in the bank on special deposite; and that the bank, not the defendant, was liable if any one was. The Court then informed the jury, that this part of the case depended on the question, whether the cashier could be sued, in this form of action, upon a bank transaction? They further said, that, as a general rule, the cashier could not be sued; and that if the act in question was purely a bank transaction, within the scope of the business of the bank, and was performed by the cashier as such, he being entirely ignorant of any of the rights of the parties, the bank alone could be sued; but that if *Anderson* had a right to the notes, and the defendant knew they had been taken from him against his consent, upon a claim of the *Massillon* bank, the defendant was a wrong-doer, and could not avoid the suit on the ground that his receipt of the notes was a bank transaction.

The defendant has no reason to object to this instruction. The ground taken by the defendant is, that his receiving and detaining the notes was entirely a bank transaction, for which the bank and not its cashier, is responsible to the party injured. But this ground cannot be supported.

We have no doubt, but that the receiving of a special deposite of bank-notes in a bank, is as much a bank transaction, as the receiving of a general deposite there of bank-notes. But the nature and consequences of the two kinds of deposites are, in law, very different. Had the notes in question been received by the cashier on general deposite, they would have thereby become the property of the bank, and their amount would have been a debt, payable on demand by the bank, to the person entitled to it. In that case, the doctrine of the defendant would be applicable. The creditor of the bank could not, in any event, have looked to the cashier for payment. His only remedy for the non-payment would have been against the bank. *Trover*, however, does not lie, even against the bank, for such a deposite. The reason is, that the bank is not liable

for the specific notes which are received on general deposite; and it is only for the conversion of specific goods that trover will lie. *Orton* v. *Butler*, 5 Barn. & Ald. 652. The proper and indeed the only remedy for the creditor, in the case of a general deposite, if payment be refused, is an action of *debt* or *assumpsit* against the bank for the breach of contract.

But the deposite now under consideration is a special one, and is governed by a different rule from that which relates to general deposites. There was here no change of property in the notes, and the deposite of them was nothing but a bailment. When bank-notes are thus specially deposited, they must be specifically delivered at the bank on demand, during banking hours, to the owner; and the refusal so to deliver them, without a sufficient excuse, like the improper refusal of a bailee to deliver the goods bailed, is evidence of a conversion; and trover may be then sustained. The conversion of a special deposite is not merely a breach of contract, but it is a *tortious* act; and it is for this reason, that though the special deposite be a bank transaction, the cashier who wrongfully withholds it cannot say to the party injured, you must look to the bank for redress.

It is no doubt true, that there are many cases in which masters have been held accountable for the misfeasances of their servants. The cases of *Michael* v. *Alestree*, 2 Levinz, 172, of *Jones* v. *Hart*, 2 Salk. 441, of *Bush* v. *Steinman*, 1 Bos. & Pull. 404, and of *Matthews* v. *The West London Water Works Co.*, 3 Campb. 403, are of that description. And it may be also true, that the plaintiff, in the case before us, if the notes are his, might have brought his suit against the bank for the alleged misconduct of its cashier. The action would unquestionably have lain against the bank in such case, if the conversion was committed by its express direction. This is shown by the case of *Yarborough* v. *The Bank of England*, 16 East, 6, which is relied on by the defendant. But admitting it to be established, that the bank is liable for the wrongful act of its cashier, the defendant, in order to avoid this suit, must go further and show that he himself is on that account excused. This, it is certain, cannot be shown. The liability of an agent for his conversion of a third person's goods, either to his own use or to the use of his principal, is not lessened by the circumstance that the principal is also liable. The con-

version is a *tort,* and, from the very nature of the act, the person who commits it is at any rate liable to the party injured, whether any other person is so or not. There are authorities to show, that an agent is liable in trover for the conversion of goods, although the conversion of them was for the entire use and benefit of his principal. This point is decided in *Perkins* v. *Smith,* 1 Wils. 328, and in *Stephens* v. *Elwall,* 4 Maule & Selw. 259. The following late case is also to the same effect:—

Trover for a bill of exchange of 200*l.,* dated *July,* 1833, drawn by the plaintiff on and accepted by *Plimpton,* payable four months after date; and indorsed by the plaintiff, by *Boyn & Co.,* and by *Roberts.* The defendant acted as clerk to his mother, who carried on the business of a coal-merchant. *Roberts,* who was employed by the plaintiff to get the bill discounted, owed the defendant's mother a considerable sum for coals, and instead of procuring the bill to be discounted, indorsed it and placed it in the hands of the defendant, who carried it to the credit of *Roberts'* account with his mother. The defendant was afterwards apprized that *Roberts* had only been employed to get the bill discounted, and was requested to give the bill up; but he refused to do so, saying he had placed it to his mother's account. The defendant objected to the action, and contended that he had acted in the business as the clerk of his mother, and that the suit should have been brought against her. The Court, however, held the defendant liable. The Chief Justice said, that the general rule is, that in actions of tort all persons concerned in the wrong are liable to be charged as principals; that in *Perkins* v. *Smith,* 1 Wils. 328, it was held that trover lay against a servant who disposed of goods, the property of another, to his master's use, whether he had any authority or not from his master for so doing. That case, he said, applied to the one then before the Court; and that the son, standing in his mother's shop, could not justify a wrong under the authority of his mother. *Cranch* v. *White,* 1 Bingh. New Cas. 414.

For these reasons we are satisfied, that the defendant cannot complain of the instruction to the jury which we have just been considering. If he is in other respects liable, the circumstance that the act complained of was a bank transaction, in

which the defendant acted merely as an agent of the bank, is no justification for him.

The next instruction has reference to the second ground of defence to the suit. The question which is presented by this part of the cause is, whether the defendant's refusal to deliver the notes, in the manner in which they were refused, amounted to a conversion? The facts are as follows: After *Forsha* had delivered the notes to the defendant on special deposite, and before the suit was brought, the plaintiff demanded the notes of the defendant. The defendant's answer was, that he would not deliver them, because the plaintiff had not come fairly by them, and because they belonged to the Bank of Massillon. There are, no doubt, many cases in which the refusal to deliver goods to the owner has been so qualified as not to amount to a conversion. If, for example, the defendant has a lien on the goods, and he refuses to deliver them until the lien is discharged, such a qualified refusal is no evidence of a conversion. But the law is otherwise, if the reason given for the refusal be not a legal one. Thus, where a carpenter who had worked in the queen's yard, discontinued his work, and the surveyor refused to deliver up his tools *until the queen's work was done*, pretending the usage to be so, it was held that the refusal amounted to a conversion. *Baldwin* v. *Cole*, 6 Mod. Rep. 212. The law is also settled, that if a party refuse to deliver goods to the owner, on the ground that they belong to himself, or that they belong to a third person, this refusal amounts to a conversion. 2 Will. Saund. 47 f, notes. In the case now under consideration, the cause assigned by the defendant for his refusal to deliver the notes was, that they belonged to the Bank of Massillon. Such a refusal is sufficient evidence of a conversion, to enable the plaintiff to recover, if the notes are his; and the Court might, with propriety, have so instructed the jury. *Wilson et al.* v. *Anderton*, 1 Barn. & Adol. 450. The instruction, however, is not so unfavourable to the defendant. It only considers the cause given for the refusal to be exceptionable, in case the defendant knew, when he received the notes, of the existing controversy respecting them. The Court might have gone further and informed the jury, that the reason given for the refusal was not a good one, whether the defendant knew or did not know of the existing

controversy. It is evident, therefore, that the defendant could not object to this instruction.

The last subject of inquiry which this cause presents for our examination, regards the third ground of defence, and has reference to the instructions of the Court respecting the plaintiff's right of property in the bank-notes, for which the suit is brought. The Court stated the ground of defence to this part of the cause to be as follows: That a forgery of a certificate of deposite, to the amount of 7,400 dollars, was committed on the Columbiana Bank of New-Lisbon, which certificate was passed at the Bank of Massillon by *George Stevens;* that the *Massillon* bank paid to *Stevens* 4,000 dollars of the amount in *Massillon* bank-notes, and the balance by a draft on the Commercial Bank of Lake Erie; that the plaintiff was a party to this forgery; and that the bank-notes for which the suit was brought, were obtained by *Stevens* on the forged certificate. In this statement, the Court inadvertently speaks of the balance which, after deducting the 4,000 dollars, was due on the forged certificate, as having been paid by a draft on the Commercial Bank of Lake Erie. That balance is alleged to have been settled, not by such a draft, but by the giving of a certificate of deposite in the Bank of Massillon. There is also another oversight in this statement. The Court omits to mention, that a part of the bank-notes for which the suit was brought, are alleged to have been obtained from the Commercial Bank of Lake Erie, on the certificate of deposite given by the *Massillon* bank. The Court gave to the jury several instructions relative to this part of the defence.

One of these instructions is to the following effect: If the notes on the Commercial Bank of Lake Erie, for which the suit is in part brought, were obtained from that bank by a certificate of deposite given by the *Massillon* bank, which certificate was procured by means of a forgery committed by the plaintiff or with his knowledge, the plaintiff has no title to the notes thus obtained, and the jury ought to find for the defendant as to those notes. This instruction is unobjectionable, and as far as it goes is in the defendant's favour.

The following is the substance of another of these instructions: The forgery of the certificate on the Columbiana Bank of New-Lisbon may be proved by circumstantial evidence; and the fact that the plaintiff obtained the notes fraudulently,

may be proved by the same kind of evidence. This instruction is correct, and is also in the defendant's favour.

The next instruction is in these words: If *Anderson* came by the notes *bona fide*, for a valuable consideration, and without notice of the forgery, he is entitled to hold them against the bank. The law is not correctly stated in this instruction. It has been decided that where bank-notes have been stolen, and the owner has not been guilty of laches, a third person who afterwards receives them, and resists the claim of the owner, must show not only that he received them as is here stated by the Court, but also that he received them with due caution. What degree of caution should be used, must depend, it has been said, on the nature of the case, and is a proper question for the jury. The security of the public against larcenies, &c. is stated to be the object of this rule. The cases of *Gill* v. *Cubitt*, 3 Barn. & Cress. 466, and *Snow* v. *Peacock*, 3 Bingh. 406, in both of which the subject is fully discussed, are authorities for this doctrine. We consider it not to be material, whether the notes be stolen or be obtained by means of a forgery. Indeed, the case of *Solomons* v. *The Bank of England*, 13 East, 135, was trover for a bank-note that had been obtained by means of a forged draft; and no attempt was there made to distinguish that case from those in which the notes had been stolen.

The following case was decided in 1833: Trover for a Bank of England note for 200*l.*, payable to bearer. The plaintiff had been robbed of the note in *September*, 1830, and had advertised his loss in the newspapers. In *June*, 1832, the note was traced to the possession of the defendant, who said he had received it in payment of a bet on the *Derby*, but could not recollect from whom. The Chief Justice, on the trial, left it to the jury to say, whether the defendant had exercised due caution in taking a bank-note of so large an amount, without making a memorandum of the name of the person from whom he received it. The jury found a verdict for the plaintiff, on the ground that the note had been received without sufficient circumspection. The Court refused a new trial, and used the following language: "The note is traced from the defendant to the plaintiff; it is of such amount that it ought not to have been taken rashly; and yet the defendant says he does not know from whom he took it.

Under such circumstances, he cannot be said to have used <span>Nov. Term, 1837.</span>
the ordinary precautions, which would be proper on such an
occasion. From *Gill* v. *Cubitt*, 3 B. & C. 466, downwards, the
decisions have put the title of the note, not on *bona* or *mala*
*fides*, but on the degree of caution with which the note has
been received. *Snow* v. *Peacock*, 3 Bingh. 406, was the case
of a bank-note for 500*l.*, received by bankers in the course of
their business; and yet it was held that the plaintiff was enti-
tled to recover, although the defendants had received the note
honestly, because, in receiving it, they had not acted with
due caution. In the present case," continues the Court, "the
defendant's dealings were not of such a nature as to entitle
him to greater latitude than a banker at his counter. We
think, therefore, that the principle of *Gill* v. *Cubitt*, and *Snow*
v. *Peacock*, should apply." *Easley* v. *Crockford*, 10 Bingh.
Rep. 243.

COFFIN
v.
ANDERSON.

It is true that the Chief Justice said, in *Snow* v. *Peacock*,
that though the negligence of the owner of stolen goods can
be no excuse for the dishonesty of the receiver, it may be an
excuse for the receiver's negligence, agreeably to the maxim
*potior est conditio possidentis*. But even if that doctrine be
correct, of which we give no opinion, it does not apply to this
case. There was no want of diligence here, imputable to the
officers of the Bank of Massillon. They very soon detected
the forgery, and issued the proper advertisements,—offering
the liberal reward of 500 dollars for the apprehension of the
offender. If they have not found him, it is not their fault.

The last cases we have seen on this subject were decided in
1834. They consider the proper inquiry to be, whether the
receiver was guilty of *gross negligence?* *Crook* v. *Jadis*, 5 B.
& Adol. 909.—*Backhouse* v. *Harrison*, id. 1098. These cases,
though they differ considerably from that of *Gill* v. *Cubitt*,
and those which followed it, still show that the instruction
under consideration ought not to have been given. The ques-
tion as to the plaintiff's negligence was an important one for
the jury—even supposing, which, however, is hardly a suppo-
sable case, that he received the notes *bona fide*. The case re-
quired, at least, ordinary diligence. The amount received was
large; the notes were new, and many of them of the denomi-
nation of 50 and 100 dollars; and the person offering them,
according to the plaintiff's own account, was an entire stran-

52

Nov. Term,
1837.

COFFIN
v.
ANDERSON.

ger whom he should not know again. It was the plaintiff's duty, before he received the notes under these circumstances, to make some inquiries respecting the person offering them, as to the means by which such person had obtained. them; and it was for the jury to determine whether the plaintiff had performed that duty.

We are therefore of opinion that, according to the authorities on the subject, and the policy of the law, the instruction now under consideration is wrong. The jury ought not to have been informed, that the plaintiff was entitled to hold the notes against the legal owners of them, provided he had received them *bona fide*, for a valuable consideration, and without notice. There was another question for the consideration of the jury, and that was, whether the plaintiff had been guilty of gross negligence in the receipt of the notes.

The following is the next instruction: If these bank-notes are the same that were obtained from the Bank of Massillon, and the plaintiff was a party to the forgery, he cannot retain them against the bank. There can be no objection to this instruction.

The following instruction was also given: If the plaintiff obtained the notes by participation in a forgery, with intent to defraud the owner out of them, and they subsequently came to the possession of the defendant, who retains them for the owner, and had the directions of the owner to retain them from the plaintiff, the defendant may set up those facts as a bar to the action. This instruction is unexceptionable.

The following is the next instruction: Where the plaintiff has a title founded simply on a *bona fide* possession, the defendant cannot defend himself by showing that a third person, between whom and himself there is no connection, has a better title than the plaintiff. The question involved in this instruction is not without difficulty. The defendant has referred us to two cases in which a different opinion is expressed from that contained in this instruction. These cases are, *Schermerhorn* v. *Van Volkenburgh*, 11 Johns. Rep. 529, and *Tanner* v. *Allison*, 3 Dana's Rep. 422. But there are highly respectable authorities on the other side of the question. The instruction is expressly sustained by the opinion of Sergeant *Williams* in his learned note to the case of *Wilbraham* v. *Snow*, 2 Saund. Rep. 47, and the several authorities which he

there relies on in support of that opinion. It is also directly
supported by the opinion of Mr. *Chitty* in the 1st Vol. of his
Treatise on Pleading, 6th Lond. ed. p. 173. This instruction
is also in accordance with the opinion of Chief Justice *Parsons*, delivered in the case of *Waterman* v. *Robinson*, 5 Mass.
Rep. 303.

It was decided at an early period, that there may be such a
special property, arising out of a lawful possession, as is sufficient to support trover. The case was that of a chimney-
sweeper's boy who found a jewel, and took it to a goldsmith
to know what it was. The goldsmith refused to return it, and
the boy sued him in trover. It was held that the plaintiff,
having found the jewel, had a right to keep it against all persons but the rightful owner; and that therefore he could maintain trover against the defendant, who was a wrong-doer.
*Armory* v. *Delamirie*, 1 Strange, 505. That case has never
been questioned, but has been frequently recognised as being
correctly decided. And it would be no easy task to show,
upon principle, that the interest in goods arising from finding
them is greater, or is entitled to any more protection from
wrong-doers, than that which arises from their *bona fide* possession in any other way, except when in the custody of a
mere servant. In *Webb* v. *Fox*, 7 Term Rep. 387, the judges
all express a decided opinion, that a lawful possession of goods
gives the possessor a sufficient property to enable him to bring
trover for them against a wrong-doer; and in support of the
doctrine, *Lawrence*, J. cites and relies on the case of *Armory*
v. *Delamirie*. The same point is decided and the same case
again referred to in its support, in *Sutton* v. *Buck*, 2 Taunt.
302. There is also a late case from which it appears, that a
mere gratuitous bailee has a sufficient property in the goods
to enable him to support trover for them. *Burton* v. *Hughes*,
2 Bingh. 173.

From an examination of these authorities, and all the others
on the subject within our reach, we have come to the conclusion that the instruction of the Court, under consideration,
cannot be objected to. If the plaintiff's possession of the notes
was not *bona fide*,—or if the *Massillon* bank was the owner of
them, and the deposite was made by a person acting at the
instance of any of its agents, or was detained by the defendant

with the express or implied permission of any such agent,— the instruction does not apply to the case.

There is one other instruction to the jury, relative to the third ground of defence, which remains to be noticed. It is as follows: "If these notes are not the identical bank-notes obtained from the Bank of Massillon on said forged certificate of deposite, the plaintiff is entitled to recover." The doctrine here advanced is, that admitting the *Massillon* bank-notes to have belonged to that bank, and to have been obtained from it by the plaintiff by means of a forgery, yet, as the plaintiff has exchanged them for other bank-notes, these other notes cannot be claimed by the bank, but are the plaintiff's own property. It is impossible that the law can sanction a doctrine that would produce such manifest injustice. There are two principles which are both violated by this instruction.

One is, that the *Massillon* bank has a right, in this case, to consider the plaintiff as its agent, both as to his holding the original notes, and as to his exchanging them for others. The bank claims the notes received in exchange for its property by the plaintiff, and thus adopts and ratifies, as its own, the act of the plaintiff in converting the property of the bank into the notes for which this suit is brought. The plaintiff cannot complain on account of his being considered an agent in the transaction instead of a wrong-doer, and there are no rights of third persons affected by this view of the case.

The other principle which is contravened by the opinion of the Circuit Court is, that the *Massillon* bank-notes in the plaintiff's hands may be considered as covered with a trust in favour of the bank; and, in that case, the change in the form of the property, though made by the plaintiff without authority, could give him no new claim to it. The *Massillon* bank-notes in the plaintiff's hands belonged to the bank, and when the plaintiff thought proper to exchange them for other notes, the bank had a right to follow its property into the new state in which the plaintiff possessed it. This point has been frequently decided. We will refer to some of the authorities.

A factor being entrusted by a merchant to sell some merchandise, sold the same for money, and instead of paying the money over to his principal, he vested it in other goods, and died indebted in debts of a higher nature. It was decided that

the goods, in such case, belonged to the merchant and not to the factor's estate. *Whitecomb* v. *Jacob*, 1 Salk. 160. This decision was made in the time of Queen *Anne*, and is the earliest case on the subject which we have met with in the books. The factor had there sold the merchant's goods for cash, and the money he thus received belonged to his principal. So, in the case before us, *Anderson* was possessed of certain Bank of Massillon notes, which, if the bank chose so to consider them, were the property of the *Massillon* bank. The factor, in the case in *Salkeld*, instead of paying the money in his hands to his creditor to whom it belonged, bought goods with it for himself, without any authority for that purpose. So, here, *Anderson*, instead of delivering the *Massillon* bank-notes to that bank which was entitled to them, exchanged them, without authority, for other bank-notes. The Court held, in *Whitecomb* v. *Jacob*, that the merchant with whose money the goods in dispute were purchased, might claim them as his property; so, in our case, the *Massillon* bank, for whose property the notes now in question were exchanged by *Anderson*, may follow its property into the new form, and claim these notes as belonging to itself.

The following is another case on the subject: *Scott & Richardson* resident in *Carolina*, consigned a quantity of tar to their factor in *London*. The factor sold the tar, and took in part payment two promissory notes payable to himself four months after date. It afterwards became a question, in consequence of the factor's bankruptcy, to whom the promissory notes belonged? Whether they were the property of the consignors of the tar, or the property of the assignees of the bankrupt-factor? It was decided, that the notes were the property of the consignors and owners of the tar, in payment for which they had been given, though they were made payable to the bankrupt, and he had delivered them over, as his own, to his assignees. In delivering this opinion, Chief Justice *Willes* says,—"We are agreed that if the goods had remained in specie unsold in the bankrupt's hands, at the time of the bankruptcy, the plaintiffs, (the consignors,) might have recovered them in an action of trover; and the present case may be determined on the same reasons. For why are goods considered still as the owner's? because they remain in specie, and so may be distinguished from the rest of the bankrupt's

estate. But as money has no ear-mark it cannot be distin-guished. Otherwise, to be sure, in reason, the thing produced ought to follow the nature of the thing out of which it is pro-duced, if it can be distinguished; and so long as it remains a debt, it is equally distinguishable; or if it be laid out in a par-ticular thing, as the case in *Salkeld* is. And the notes are within the same reason." *Scott* v. *Surman*, Willes' Rep. 400.

This is a strong case in favour of considering the bank-notes in question as the property of the Bank of Massillon. It is, indeed, in point, provided the circumstance of the notes being bank-notes does not make a difference; and we know of no reason why it should make any. Bank-notes are not, by their nature, incapable of being identified. They are not generally, it is true, so easily distinguished as other goods are, but that has relation only to the proof. Bank-notes, so far as this ques-tion is concerned, are on the footing not of money, but of other personal property.

The next case we shall notice is the following: *Sill & Watson*, by means of a fraud, obtained from *Hadwen*, as a loan, certain bills of exchange to a large amount; and they afterwards procured one of these bills to be discounted, and obtained for it bank-notes of the Bank of England. *Sill & Watson* became bankrupts, and it was made a question be-tween their assignees and *Hadwen*, as to whom the bills of exchange remaining on hand at the time of the bankruptcy belonged, and also as to whose property the bank-notes were which the bankrupt had received for one of the bills. It was decided, on the authority of *Scott* v. *Surman*, which we have already noticed, that the bills and bank-notes belonged to *Hadwen*, the original owner of the bills. In this case, Lord *Ellenborough*, after showing that the bills continued to be the property of *Hadwen*, the original owner, concluded with these words: "A distinction has been made in argument as to the bank-notes, and it has been urged as to them, that although the assignees might have no right to the bills as long as they remained undisposed of, yet they were entitled to the proceeds when discounted: but we think that as the bank-notes were not mixed with the rest of the bankrupt's property, and are capable of being distinctly traced, they stand in the same position as the bills themselves, and therefore cannot be reco-vered." *Gladstone* v. *Hadwen*, 1 Maule & Selw. 517.

In the case last cited, the bills of exchange, like the *Massillon* bank-notes in the case before us, had been obtained from the owner by a fraud; and the property in the bills, therefore, was not vested in the fraudulent holder. One of those bills, like the *Massillon* bank-notes, had been exchanged for bank-notes. And the Court decided, that not only the remaining bills of exchange, but the bank-notes also which had been received for one of the bills, were the property of the original owner of the bills.

There is one other case on this subject to which we must refer. Sir *Thomas Plumer* had the sum of 22,200*l*. in the hands of his *London* bankers, with which he wished to purchase exchequer bills. He accordingly requested a broker by the name of *Walsh*, to buy the bills for him; and, to enable *Walsh* to make the purchase, *Plumer* drew a draft on his bankers, in *Walsh's* favour, for 22,200*l*. *Walsh* took this draft to the bankers, and received the money for it in notes of the Bank of England. He then purchased with a part of these notes exchequer bills for *Plumer* to the amount of 6,500*l*., and lodged them with *Plumer's* bankers. But he determined to defraud *Plumer* out of the residue of the Bank of England notes. To effect his fraudulent purpose, *Walsh* purchased, with the remaining bank-notes, a certain number of shares in the Bank of the United States, a certain amount of 3 *per cent. United States'* stock, and 71 doubloons and a half; and with this property, he attempted to make his escape from *London* to the *United States*. He hastened away in the mail-coach to *Falmouth;* but whilst he was there waiting for the sailing of a packet, *Plumer's* attorney overtook and arrested him. *Walsh* gave up the certificates of stock and the doubloons to the attorney, who delivered the same over to *Plumer*. *Walsh*, in the mean time, having been declared a bankrupt, his assignees, after a demand and refusal, sued *Plumer* in trover for the property. The cause was decided in favour of the defendant, on the ground that although his Bank of England notes had been exchanged by *Walsh* into the securities for stock and the doubloons, still the defendant had a right to follow his property into the new form into which it had been converted.

In delivering the opinion of the Court in this case, Lord *Ellenborough* said, that it made no difference into what other

form, different from the original, the change of the property had been made; for the product of or substitute for the original thing, still follows the nature of the thing itself, as long as it can be ascertained to be such; and the right only ceases when the means of ascertainment fail; which is the case when the subject is turned into money, and mixed and confounded in a general mass of the same description. The difficulty which arises in such a case, continues the Judge, is a difficulty of fact and not of law, and the _dictum_ that money has no ear-mark must be understood in the same way; that is, as predicated only of an undivided and undistinguishable mass of current money. But money in a bag, or otherwise kept apart from other money, guineas or other coin marked, (if the fact were so,) for the purpose of being distinguished, are so far ear-marked as to fall within the rule on this subject, which applies to every other description of personal property, whilst it remains (as the property in question did) in the hands of the factor, or his general legal representatives. *Taylor* v. *Plumer*, 3 Maule & Selw. 562.

These last two cases are as much opposed to the instruction in question, as the others to which we have referred. It will hardly be said that the doubloons, mentioned in *Taylor* v. *Plumer*, could not be called money with as much propriety as bank-notes, or that they could be more easily identified. It may be also observed that a late *English* writer, in reference to stolen goods, says, that " if the goods be not restored upon conviction, the owner may maintain trover for them. Even where they are not the identical goods, but the produce of them, the action will lie." Morton on Vend. 172. The writer cites several cases in support of this doctrine, and we consider it to be correct. It is similar, in principle, to the doctrine recognised by the cases which we have just been examining. It appears to us, without looking any further into this subject, that there can be no doubt but that the Circuit Court, in this instruction respecting the *Massillon* bank-notes connected with the cause, has committed an error.

We have now, we believe, noticed the various objections made by the plaintiff in error to the proceedings exhibited by this record. The judgment must be reversed and a *venire de novo* awarded.

*Per Curiam.*—The judgment is reversed, and the proceed- ings subsequent to the issue on the plea of not guilty set aside, with costs. Cause remanded, &c.

Nov. Term, 1837.

*C. H. Test, J. Perry, C. B. Smith, M. M. Ray,* and *J. B. Ray,* for the plaintiff.

*J. Rariden* and *J. S. Newman,* for the defendant.