Mr. Justice Walker delivered the opinion of the Court. This case comes before us upon petition for Habeas Corpus, and presents for our consideration the question of the extent of Executive pardon under our constitution and statutory regulations, and its effect when exercised. In all criminal and penal cases, except treason and impeachment, power is conferred by the constitution upon the Governor to grant pardons after conviction, and remit fines and forfeitures under such rules and regulations as shall be prescribed by law. (Cons. Art. 5, Sec. 11.) The legislative rules and regulations, prescribing the manner of exercising this constitutional grant of power, are that in cases of convictions punishable with death, imprisonment for six months and over, or with corporal punishment, the Governor may grant pardons with such conditions and under such restrictions as he may think proper; and he shall have power to commute the punishment of persons under the sentence of imprisonment for six months and over, or corporal punishment by substituting banishment in lieu of the sentence of the Court. Digest, Sec. 244, p. 424. From the facts presented by the petition, it appears that Hunt, a convict in the Penitentiary, sentenced to imprisonment for the period of seven years and one day, presented to the Governor his petition praying to bo pardoned and discharged from the sentence of the Court and imprisonment; and that, upon due consideration thereof, the Governor granted to said petitioner, under his proper signature and the seal of State, a full and free pardon of and from the offence of receiving and passing counterfeit gold coin, for which offence he had been convicted and sentenced in due course of law, and the conviction and all further imprisonment and punishment in consequence of said sentence and conviction, bearing date the 4th of August, 1849, and in which deed of pardon it was expressed that, after the petitioner should be released and set at liberty under such pardon, he should leave the State of Arkansas without delay, which pardon he received on the day of its date, and was thereupon released and discharged from said Jail and Penitentiary house and from all further imprisonment or restraint: and that he did, within eight days thereafter, depart from and leave the State of Arkansas, and go into the State of Tennessee : that, subsequently, he returned to this State, and, as he alleges, has been arrested, and is now detained and imprisoned in the jail and Penitentiary house of this State, wrongfully and without lawful cause. The act which prescribes the rules and regulations by and under which this constitutional exercise of Executive power is to be exercised, has prescribed rules, 1st, for a general exercise of power-under terms such as the Governor may choose to annex ; and, 2d, for its exercise by commuting the punishment of a certain class of cases, upon specific terms, defined and limited in the 245th Sec., Digest, p. 424, which is as follows: “ In all cases where any person shall be convicted of a criminal offence, and shall be sentenced to imprisonment, &c., if such convict shall agree, as a condition of his pardon, to leave the State, and never again return to it, th'e Governor may pardon him on such conditions; and if such convict shall, at any time, after the granting of such pardon be found within this State, the sentence passed on him by the Court shall be executed in the same manner as if no such pardon had been granted.” By comparing the conditions annexed to the pardon in this case with these provisions of the law, it will, at once, be seen that the Executive clemency was exercised under his general discretionary power, not this latter special statutory clause. This is evident, because the terms annexed to the pardon are clearly within the power conferred to grant pardons prescribing his own terms, and cannot be made to apply to the latter clause for the obvious reason that the statute having specifically defined the conditions, terms, and penalties for a violation of that clause, the Executive has no discretion in regard to such punishment, and when he designs to act under it, must adopt its provisions. The fact, therefore, that he did not conform to this latter statute, must be taken as strong evidence that he did not intend doing so. If he did, however, and has inadvertently omitted part of the provisions of the law in the condition annexed to his pardon, we are not at liberty, by presuming what his intention might have been, to impose other and different terms upon the convict than the language used imports. Penal law's are ever construed strictly and in favor of liberty, (United States vs. Wilson & Porter, 1 Bald. C. C. R. 78;) and pardons are to be construed most favorably to the convict. 4 Black. 401. 1 Chit. Cr. Law 772. As there is nothing ambiguous in the language used, and nothing irreconcilable with the pardon itself, no room is left for construction. We are not unmindful of the argument used that that unless it be supposed that the Governor intended that the convict should depart the State, and not return to it again, when he used the language “ to depart without delay,” without prohibiting his return, the condition would impose only a nominal punishment, in no wise commensurate with the crime for which he was sentenced. To this it may be replied that the exercise of power conferred upon the Executive is invoked upon the presentation of facts unconnected with, and sometimes wholly independent of, the crime committed, and the pardon is granted or refused under a sound discretion, in the view of the crime, the punishment and the ameliorating circumstances presented by petition or otherwise. What the facts were upon which the Executive acted in this case, we have no means of knowing, nor is it our province, in the slightest degree, to scrutinize them or question their'correctness. The presumption is that the facts well warranted the grant of pardon upon the terms and conditions annexed, and such also would have been the conclusion had a,n unconditional pardon been awarded. The liability of the convict to be re-captured and imprisoned, depends upon his violation of the conditions imposed by the statute, to which he is required to give his consent, and if we were, in the absence of express language, to construe the terms impo-posed by the Executive as equivalent to the conditions imposed by the latter clause, we should also be compelled by inference to presume that he assented to terms and conditions never proposed to him. In the further investigation of the case, we will consider the pardon as having emanated from the Executive under his discretionary power to pardon upon terms prescribed by himself, and not under those prescribed as applicable to commutation of punishment under the latter clause of the act. The pardon, like a deed, took effect from its delivery. Its effect was to restore the convict at once to the right of liberty and citizenship. In Lilly’s Abr. 270, it is said “ A pardon doth discharge not only the punishment which was to have been inflicted upon the person that did commit the offence pardoned, but also the guilt of the offence itself. It pardons culpa so clearly that, in the eye of the law, the offender is as innocent as if he never had committed the offence. So far doth mercy extend therein.” We have seen that the condition annexed to the pardon was, that the petitioner should leave the State without delay. This condition having- been complied with, however it may be in point of fact and morals, in the language of Chief Justice Marshall, “ The pardon exempts him from the punishment which the law inflicts for the erimé he has committed,” 7 Pet. 159; or, in the still stronger language of Lilly and Coice, “In the eye of the law, the offender is as innocent as if he never had committed the offence.” It has been argued, with much ability, that the rights of the citizen thus acquired could not be forfeited even by a violation of the condition annexed to the pardon, and, if mistaken- in this, that a forfeiture of the condition could not so operate as to' revive the old sentence, even though such violation might become the ground for a new prosecution. The conclusions to which we have arrived, render it unnecessary to decide these questions, — the condition annexed to the pardon, in our opinion, not having, in this instance, been broken. From all the facts of the case as presented, (and, having been sworn to, we must consider them as true for all the purposes of the application,) we are of opinion that the writ of Habeas Corpus should issue in accordance with the prayer of the petition. Let the writ issue. Scott, J. A series of decisions of this Court, and a uniformity of action from the first year of its existence, have established the rightful exercise of original jurisdiction here in cases like this. And entertaining, as I do, the most profound respect for the Judges who established this doctrine, (and no less for my brother Judges, who hold it correctly established,) I feel no little embarrassment in placing myself in an attitude of dissent. Yet, so strong are my convictions that there is no just foundation in the constitution for this jurisdiction, that I feel that I would not be true to my trust if I did not avail myself of the first occasion, when the question might arise, to protest against its exercise and present at least an outline of my views. No one is more sensible that uniformity of authoritive decisions is, for obvious reasons, of great importance in the administration of justice, and I am, therefore, far from feeling that the rule, stare decisis, has no binding authority. On the contrary, without it, it would be difficult, if not impossible, to build up and preserve any valuable system of jurisprudence; and especially do I hold this rule applicable to decisions upon constitutional questions, when such decisions may settle the basis of important public interests, or some system of laws, the other-throw of which might vibrate throughout the State and tend to produce anarchy and confusion. But the rule, as I understand it, is not one that is despotic and inexorable in its operations, but, on the contrary, is of mild and beneficial sway, and, when justice is to be advanced and the means are clearly pointed out, and they contemplate no private or public wrong, it interposes no barrier at all. Then, if my conclusions will lead to the result indicated, and I shall be successful in pointing out the means, I may rightfully examine this question untrammeled by this rule, and may look to the provisions of the constitution erecting the judicial system of this State as freely from every point of view as if there had been no judicial exposition of any of these provisions. It is not my design, in this opinion, to go into an elaborate exposition of the question I propose to examine, pursuing the main question even, much less the collateral ones, into all its ramifications and bringing it to the test of authority even where it is at hand. On the contrary., I design nothing beyond an outline sketch by which I shall hope to present my views intelli.gibly, postponing the more thorough work to a period when it may be demanded, should such a period arrive during my stay upon the bench. Before entering upon the task before me, I will premise that I shall not attempt to maintain that this Court has no original, or rather primary, jurisdiction whatsoever: on the contrary, I hold that it has all such original or primary jurisdiction as may be necessary to enable it to exercise the powers of general superintendency and control over all inferior jurisdictions, committed to it by the constitution, while,'at the same time I shall maintain that these powers of superintendency and control, so far from being all of this nature of original jurisdiction, as seems to have been supposed, are, for the most part, in their very essence and nature, revisory: and that even the original or primary jurisdiction, that I have conceded, is so fenced up by the end and object for which it was granted, that it can never be rightfully called into exercise unless where the incumbent of the proper subordinate tribunal may be incapacitated to- act, or unless where all subordinate tribunals may be imcompetent. But I shall endeavor to maintain that this court has no original jurisdiction whatsoever other than that indicated; and, consequently, has none such as has been frequently exercised here in cases of Quo Warranto, and as is called into exercise by the case at bar. If there be any such, the constitution is the source; and that Í will proceed to examine, keeping within my recollection the rule of Judge Story, (often quoted with approbation,) “That we should, regard the constitution as a frame of laws and not as ordinary statutes, and that the great end and aim of all just interpretation are to ascertain and determine the sovereign will of the people who formed the constitution; that the whole instrument must be taken together, and that its true intent and meaning can only be ascertained and defined from the great objects and purposes for which the government.was instituted; that any other construction will abridge great fundamental principles which are supreme, and enlarge those which are restricted beyond their true meaning.” Commencing then, with the justices’ courts, the most inferior and limited in jurisdiction, and passing through the Probate and County Courts, and an occasional corporation Court, into the Circuit Court, invested with original jurisdiction in common law and chancery, and civil and criminal matters, with capacity to be authorized to hear appeals from a limited field and clothed with a superintending control over the County and Probate Courts, it is impossible not to be attracted by the completeness of the provision made for the hearing originally of every case that can possibly arise, so far as human foresight can anticipate. In some cases, two tribunals have concurrent original jurisdiction. In others, original jurisdiction is exclusive in one tribunal only; and in others it is original, but not exclusive, so that another tribunal of original jurisdiction, if not incapacitated in its constitution, may, by legislation, be authorized to exercise the same concurrently, at the same time that a constitutional provision for its concurrent exercise in an emergency would not be an inconsistent provision. Thus providing for the punishment of offences of every grade, from the violation of the lowest penal statute up to the gravest public crime, and for the assertion of every civil right of every- grade and character, whether the party be a natural or an artificial person, or the latter a public or private one. Then, above all this machinery, for the exercise of original jurisdiction, is placed the Supreme Court, invested with two great powers: the one appellate purely, and the other a general power of superintendency and control over all inferior jurisdictions. The one designed for the correction of errors in the proceedings and judgments of the subordinate courts; the other, to preserve harmony in the whole system by forcing each subordinate tribunal to keep within its sphere of action, and to prevent a failure of justice in extreme cases, from any inherent defect in the subordinate tribunals or incapacity of its incumbent; and, for these ends, this tribunal is necessarily invested with the residuum of judicial power not invested in the tribunals by the constitution or reserved within the discretion, express or implied, of the Legislature, and as to the latter, entrusted with their custody until withdrawn by the exercise of this discretion. Now these powers of general superintendency and control over all inferior jurisdictions designed to subserve tbe two ends just pointed out, so far from being power wholly of original jurisdiction, are, as I have already remarked, for the most part, revi-sory in their essence and nature; and this latter class can be rightfully called into exercise only when some subordinate Court has either done some act or refused to do some act. And, in like manner, the other class, which are powers of original or primary jurisdiction cannot rightfully be exercised, but when there would otherwise be a failure of justice by reason of some inherent defect in the subordinate tribunals or incapacity in the incumbent, and thus both classes of this general power are forced up by the end and object for which they have been conferred; and this Court is thus constitutionally inhibited from the exercising of either class unless upon the happening of the contingency contemplated by the constitution to call them or either of them forth. Now, in order that this power of general superintendency and control invested in this Court by the constitution, and embracing, as we have seen it does, jurisdiction, both revisory and original, and designed to subserve the two ends pointed out, should be effective for both these ends, it was indispensable that the jurisdiction conferred upon the subordinate courts should not all be exclusive, because, had this been so, inasmuch as the jurisdiction actually conferred upon these courts seems to embrace all cases whatsoever, whether of civil or criminal, common law, equity, or of other cognizance, no original jurisdiction would have remained to have been exercised concurrently by any other Court in any emergency, and consequently this power of superintendency and control could have had no place for action, only in so far as to preserve harmony in the system, by enforcing upon each subordinate Court the duty of acting within the sphere attached to it, accordingly it is that the jurisdiction conferred upon these subordinate Courts, is, for the most part, not exclusive, and in the few cases where the jurisdiction is conferred exclusively, they belong to one of two classes, that is to say, where the subject matter is of too inconsiderable import to demand that they should be provided for in any extraordinary manner, as matters within the exclusive jurisdiction of a justice of the peace; or else where they are of such delicate and grave import, as crimes amounting to felony at common law, (involving seriously as they do personal liberty,) committed to the Circuit Court, that it were more safe and consonant with the principles of our government, as to such matters, that there should be inconvenience of a possible defect of public justice, rather than to place such causes within the sphere of the operation of ultimate powers that, in their nature, were, to some extent, undeñnable. And, therefore, by investing the subordinate courts with exclusive jurisdiction of these two classes of cases, they were thereby excluded from the operation of these ultimate powers for the reason I have indicated, although otherwise, as to these matters, there might be defect of justice, and, consequently, as to these two classes of cases confining the exercise of the powers of superintendency and control only to the office of enforcing upon the subordinate tribunals entrusted with their exclusive original jurisdiction the duty of keeping within the legitimate sphere of their action, and thus presenting one reason why the incidental power of issuing the writ of Habeas Corpus was invested in the Supreme Court, that a party might be relieved by the Supreme Court in the exercise of the power of superin-dency and control by the instrumentality of this writ after effort elsewhere had proved vain, whereby a foundation would be laid for the exercise of this power, or where the Circuit Court had infringed upon personal liberty by an act entirely without its orbit. Nor was it less important, in order that this power of superintendency and control thus defined, should be effective for the two ends designed, that means should be provided commensurate with their scope and design; and although, as a general rule, the proper means might be regarded as included in the grant of the end, yet, inasmuch as here was a grant of-great ultimate powers, limited in their exercise, it is true, by the ends for which they were granted, nevertheless, as they were, in the very nature of things, in a great degree, undefinable, the express grant of commensurate means was scarcely a work of supererogation, while, at the same time, it more distinctly indicated the nature, scope, and extent, of the ultimate powers granted; hence the grant of the incidental “power to issue writs of Error and Su-persedeas, Certiorari and Habeas Corpus, Mandamus and Quo Warranto, and other remedial writs, and to hear and determine the same.” Thus placing' within the undisputed power of this Court not only all the means necessary for the performance of the first great object of its creation, (its appellate functions,) but also all possible means for enforcing the duty upon subordinate courts to keep within their orbits, and for vindicating personal liberty unlawfully invaded when remedy elsewhere cannot be found, or when the result of some action, of the Circuit Court entirely without its sphere, and like means of compelling the adjudication of rights in the subordinate courts; and, finally, for the administration of justice in all matters of civil 'cognizance, not exclusively committed to the original jurisdiction of the subordinate courts in cases where otherwise there would be a total failure of justice by.reason of some inherent defect in the subordinate tribunals or else incompetency of the incumbents. Here, then, seems to be a judicial system of great perfections, with capacity to administer justice in almost every conceivable case, and capable of moving on with perfect harmony in all its parts, providing for the administration of justice in courts of original jurisdiction in all the townships and counties, for the convenience of suitors, and securing the right of revision of every suit in a Court of Errors and Appeals, should injustice be done in the courts of original jurisdiction. 1st. I urge, then, the completeness of this system as a reason for repudiating any other, or additional original jurisdiction in the Supreme Court: 2d. That the exercise of ordinary original jurisdiction here would defeat two objects evidently contemplated in this system, that is to say, the administration of justice at places convenient to the homes of suitors, and that of securing to them the advantages of revisal in a court of Errors and Appeals: 3d. That it is not probable that while'the advantages of revisal were secured for every dissatisfied suitor in matters of importance, however small, it was the design of the convention to subject the most important interests of the State to a mode of trial whereby this could not be attained. But I chiefly urge against the proposition, the want of any warrant for it in any provision of the constitution. That provision authorizing this Court to issue certain specified and .other remedial writs, and hear and determine the same, is the only provision ever relied upon' to sustain the proposition. And it would seem to be most difficult to sustain it on this foundation for the reason that if it proves any thing it proves too much. And those who have rested the jurisdiction in question here, seem to have been fully sensible of the difficulty, and, to remove it, have assumed two propositions, each of which seems alike untenable. The one position is, that the appellate power of this Court is not derived from the following provisions of the constitution, that is to say: “The Supreme Court, except in cases otherwise directed by this constitution, shall have appellate jurisdiction only, which shall be co-extensive with the State under such restrictions and regulations as may from time to time be prescribed by lawbut is derived from that other provision authorizing this Court “to issue writs of Error and Supersedeas, Cer-tiorari and Habeas Corpus, Mandamus and Quo Warranto, and other remedial writs, and to hear- and determine the same.” And the other position is, that the writs just enumerated confer original jurisdiction of all cases to which they may be made to apply, and the “ other remedial writs” do not confer jurisdiction, but are means to be used “ in the exercise of appellate powers, or the powers of control over inferior or other courts.” , Now as to the first position: If that be true, then, the Supreme Courts of several of the States have no appellate jurisdiction at 'all. Take the case of the Supreme Court of Alabama, for instance, and the provision of the constitution of that State, in relation to which, is, to the letter, like that oí several of the States. It provides as follows, to wit: “ The Supreme Court, (of Alabama,) except in cases otherwise directed by this constitution, shall have appellate jurisdiction only, which shall be coextensive with the State under such restrictions and regulations not repugnant to this constitution, as may from time to time be prescribed by law: Provided, That the Supreme Court shall have power to issue writs of Injunction, Mandamus, Quo Warranto, Habeas Corpus, and such other remedial and original writs as may be necessary, and to give it a general superintendency and control of inferior jurisdiction.” And these are all the provisions touching that Court, and there it has never been doubted but that in these provisions there was an express grant of appellate jurisdiction, and it has been always held there in the provision touching the power of superintendency and control over inferior jurisdiction there was a grant as to this jurisdiction, both of revisory and original, but that the Court was inhibited from the use of both, unless, as to those which are revisory, application had fii'st been made to all subordinate jurisdiction before coming to the Supreme Court, and, as to those which were original, it was shown that no subordinate tribunal could act, either from some inherent defect in the tribunal or incompetency in the incumbent. Nor was it ever supposed there that there was any necessity, in addition' to the express grant of appellate power, for an additional grant of means to be used in the exercise of this power in order to create the power itself. And it would seem that, if the provision I have first above quoted from the constitution of Arkansas, is not an express grant of appellate power, it would also follow that the next provision following it in the constitution, to wit: “ It shall have a general superintending control over all inferior and other courts of law and equity,” is no grant of power; the only difference between the two grants being a provision for the restriction and regulation of the first from time to time by the Legislature. To my mind, the proposition that this is an express grant of appellate power is too plain for argument. It being taken, then, that this is* an express grant of appellate power, if the following provision as to the writs be also an express grant of substantive appellate power, then this appellate jurisdiction is twice expressly granted in the same section of the constitution, which would be so totally unnecessary and purely supererogatory as not to be imputed to a body so wise as a convention of the people. If, on the other hand, the second provision, instead of being taken as a grant of substantive appellate power, is to’ be held as a grant of means for the exercise of the appellate power already granted, although in some sense a work of supererogation, yet, in another sense, it were, in truth, but a work of caution and prudence not unbe-fitting a body so wise. And so also of the power of superintendency and control, the Court having been by express provision invested with this, including judicial power, in the very nature of things, to a great extent undefinable, the grant of very extensive means in the specified and other remedial writs, not only was in like manner a work of caution, but also in some sort indicated the nature of the power to be exercised through the instrumentality of these means. And, finally, as to this position, to derive power from such a source as this, in the face of an express grant of the very power sought to be thus derived, seems to be almost a refusal to look at substance in preference to mere form. As to the second position, it cannot be maintained without a departure from the principle of the first, and is, therefore, inconsistent with it. Now the principle of the first position is, that the grant of the power to issue the writs of Error, Supersedeas, &c., is the grant of substantive appellate power, (See Ex parte Anthony, 5 Ark. 365;) if, then, the writs are the root of the power, must not all the writs equally spring up power? Is there any thing in the constitution to indicate that, if this was the sowing of the seeds of power by the convention, it was not a broad-cast seeding? Upon what, then, does the assumption rest that the specified writs were to be the root of power, and the “ other remedial writs” ancillary only to some of these very roots, although all were sown together promiscuously ? Why, simply, that discord would thereby be the result as different provisions in this system would then conflict. Then why adopt the principle at all, if another principle, given full play, would harmonize all the provisions ? There was no necessity for it in order to derive the appellate powers of the Court, for there "was an express grant of appellate powers, and therefore these powers needed no derivation, nor was there any necessity for it to derive the powers of superintending control, for these were also expressly granted. Then the principle was assumed only to sustain the theory of original jurisdiction, and, to enable it to do this, one end of it had to be unnaturally forced into one part of the system, and then used as a basis for the derivation of powers that needed not to be derived, because they were expressly granted, and the other end had to be broken off to prevent its lacerating the balance of the judicial system. Then, as this theory of original jurisdiction, independent of and not connected with the power of superintendency and control, cannot be maintained upon the foundation of the incidental power to issue the specified writs, it cannot be maintained at all: and so I hold. And, inasmuch as so much of the powers of superintending control, as are of original jurisdiction, cannot be called into rightful exercise until a case is presented, showing/all proper subordinate tribunals incompetent to act either by reason of some inherent defect in the tribunals themselves, or incompetency of the incumbents to grant the remedy sought, as that by Habeas Corpus in this case, and therefore, unless this Court should issue it, there would be a failure of justice, and no such showing having been made in this case, in my opinion, the writ of Habeas Corpus applied for cannot be rightfully issued. And, inasmuch as there has been in this case no showing that there has been any effort made to obtain from the appropriate subordinate courts the relief sought here, and of refusal or failure to obtain the relief there, and therefore no foundation laid for the exercise of such of the powers of superintendency and control as are in their nature revisory, this Court cannot, in any way, take rightful cognizance of the case. It is therefore that I dissent. But a majority of the Court holding otherwise, and entertaining the opinion, as I do, that the authoritive exposition of the law made by this tribunal and persisted in by a majority of the Court, must be received as 'the law itself, and, as such, executed by all the magistrates in the State until such time as by an overruling of such exposition, the law may be otherwise unveiled, as in no other way can the scales of justice be kept even throughout the State, and, feeling my conscience no more involved as to this than when I was upon the Circuit Bench, and no other duty imposed upon me in this connexion than to test the adherence of this Court to these doctrines as each case involving them may arise, I have not hesitated to join with my brother Judges in the investigation of this- application upon its merits,, and have, in this aspect, agreed with them that the writ should be issued.