The State v. Vincent.

## The State v. Vincent.

1. **Evidence:** CRIMINAL LAW: RES GESTÆ. In a prosecution for murder committed while the deceased and the prisoner were journeying together, evidence of the statements of the deceased, while engaged in the journey, as to where they came from and where they were going, though not made in the presence of the prisoner, is admissible as part of the *res gestæ.*

2. —— CONTRADICTORY STATEMENTS: SUPPORTING TESTIMONY. Where the credibility of a witness is sought to be impeached by proof of his having made or testified to, elsewhere, statements different from and conflicting with his testimony, evidence that he made statements long before the trial corresponding with his testimony is not admissible for the purpose of supporting him.

3. —— EXCEPTIONS TO THE RULE. But if a witness is charged with a design to misrepresent on account of his changed relation to the parties or cause, evidence that he made like statements before such change of relations, is admissible; so, if it is attempted to be shown, that his evidence is a recent fabrication, or where long silence concerning an injury is construed against the injured party, it may be shown, that he made similar statements soon after the transaction in question.

4. —— CRIMINAL LAW: DECLARATIONS OF DECEASED. In a prosecution for murder in which one theory of the defense was, that the body found was not that of the person with the murder of whom the prisoner stood charged, evidence that such person before he left home informed the witness that he intended soon to leave and never make himself known to, or be heard from by, his family, was held inadmissible.

5. —— MEDICAL TESTIMONY: CONCLUSIONS NOT ADMISSIBLE. In such a prosecution it appeared, that the head of the murdered man was found severed from the body, and taken by a physician and preserved in alcohol. On the trial, it was exhibited to the court and jury and identified by a number of witnesses for the State as the head of the person with the murder of whom the prisoner was charged. Thereupon the prisoner proposed to prove by two witnesses, who were physicians and surgeons, that on account of the natural and inevitable changes which the human body must necessarily pass through after death, and with which they were familiar from their professional knowledge, it was not possible for any one to identify the head. *Held,* that the evidence was not admissible, for the reason,

The State v. Vincent.

that it proposed to give merely the conclusion of the witnesses instead of the facts leading to a conclusion which it was the proper province of the jury to determine from such facts. It would be competent in such case for the witnesses to state the character and nature of the changes produced by death, and to explain or illustrate to what extent this change had operated upon the head in question.

6. —— BURDEN OF PROOF: ALIBI. When the death of a person alleged to have been murdered is *prima facie* established by the identification of a dead body, as his, the burden of proof is upon the prisoner to show, that such person is still alive. To establish a defense of this character, the same weight of evidence is necessary as that to sustain an *alibi* of the prisoner.

### *Appeal from Powesheik District Court.*

SATURDAY, MAY 16, 1868.

KIRK G. VINCENT was indicted at the December Term, 1866, of the District Court of Powesheik county, for the murder of Claiborn Showers, and at the April Term, 1867, of said court, was convicted of manslaughter, and sentenced to imprisonment in the penitentiary for the term of eight years. The prisoner appeals to this court. All facts necessary to a proper understanding of the points decided will be found in the opinion.

*Martin & Murphy* for the appellant.

*Henry O'Connor*, Attorney-General, for the State.

BECK, J. — The alleged crime for which the prisoner stands convicted, was committed in May, 1863, and he was not arrested for more than three years afterward. The evidence against him is almost exclusively of a circumstantial character. We can scarcely refer to a case that has fallen within our knowledge, which presents such numerous, varied, complicated, and at the same time, concordant circumstances, upon which it became necessary to determine the guilt or innocence of an ac-

cused, as the record before us discloses. The identity of the prisoner and the deceased; their presence together in the neighborhood where the body of the murdered man was found, at the time the crime was committed; dates of facts and circumstances, necessarily developed, indicating the guilt or innocence of the prisoner, all were mainly and most of them wholly established by circumstantial evidence. The defense is based on an alleged *alibi* of the prisoner, and also that the body of the murdered man was not in fact that of Claiborn Showers, who, it is claimed by the prisoner, was in life long after the date of the crime.

In support of the theories of the prosecution and defense, a great number of witnesses were examined, many of whom resided at distant places and in other States.

Facts and circumstances were proven that transpired hundreds of miles away; positive testimony was sought to be overthrown by proof of inconsistent circumstances, which were also attempted to be sustained or overthrown by other corroborating or conflicting facts. Taken together, the evidence, as it appears in the record, is intricate in the extreme, and very voluminous, covering four hundred pages. The trial below, as well on the part of the State as for the defense, was conducted with marked ability. The number of errors assigned upon the record, and urged upon our attention, do not equal the number usual in cases of like character, a fact readily accounted for by the abundant evidence we have in the record of the careful and impartial manner in which the learned judge presiding at the trial, discharged his duty in the conduct of the case.

I. During the progress of the trial, the State introduced evidence tending to establish the fact, that the

1. EVIDENCE: criminal law: *res gestæ.* prisoner and deceased, about the 27th day of April, 1863, were together in Monticello, in

Jones county, having in their possession a team, answering in description to one taken by deceased from his home, in Henry county, Illinois, which they traded at that time for another team, a span of dun colored horses, with which they left on their journey, going in the direction of Powesheik county, where the alleged crime was committed.

Evidence was also introduced by the State tending to prove, that the prisoner and deceased were, a few days before the discovery of the body of deceased, who evidently met death by violence, within half a mile of the place where the body was found, having in their possession a team of dun colored horses. They spent the night together and had conversations with a witness for the State, John Mariatt, in the presence of each other, in which they referred to the fact of their having been that day in Marengo, and related that the deceased had driven the team away and left the prisoner, giving him much trouble in overtaking his comrade. Another witness had testified that the prisoner, who was well known to him, was in Marengo about the day the said conversations were had, in company with another man, who was driving a dun colored team; that he conversed with the prisoner, who hurried away because his companion with the team was leaving the town, going westward, toward the place where they spent the night, and where the said conversations were had. The deceased informed the witness John Mariatt, at that time, but not in the presence of the prisoner, that he had traded for the team at Monticello; that he and his companion were from Wisconsin, and were going to the gold mines. After the introduction of the evidence, against the objection of the prisoner's counsel, the court, upon their motion, struck out all that part thereof in regard to trading horses at Monticello, and informed the jury that it was excluded from their consideration, —

holding, however, that what the deceased "said about where they had come from, and where they were going, being engaged in the journey, might be received as part of the *res gestæ*, but that other conversation, not in the presence of the accused, was excluded, and that made in his presence, he taking part in the conversation, admitted." The admission of the evidence of the witness John Mariatt, relating to the declarations of the deceased, under this ruling, is assigned for error, and is the first point pressed upon our attention. We do not think the evidence is obnoxious to the objection, that it is a narrative of a past occurrence, as urged by the prisoner's counsel, but that the rule as laid down by the District Court, is correct and sustained by the authorities. 1 Greenl. Ev. § 108.

II. Two witnesses on behalf of the prisoner testified, that deceased, Claiborn Showers, was at their house in

2. —— contradictory statements: supporting testimony.

Davenport, in 1865 ; and a third one stated, that he had seen him in 1864, upon the battle field of Allatoona, Georgia. The credibility of these witnesses was assailed upon cross-examination, that of one, also, by an effort to show, that he had made a different statement on oath, and of another, likewise, by evidence showing, that she had made statements conflicting with her testimony. To support the evidence of these witnesses the prisoner offered to prove, that they had made statements agreeing with their testimony upon the trial long before the arrest of the prisoner, and before he was suspected of the crime, and before the witnesses had heard that it was believed Showers had been murdered ; the court refused to admit such testimony, and this ruling is assigned as error.

When the credibility of a witness is impeached by direct testimony of his want of reputation for truth, or of his general moral character (which may be done under our statute), or by proof of his having made or testified to

different and conflicting statements, he cannot be supported by evidence, that statements of the facts made by him before the trial correspond with his evidence.

The following are exceptions to the rule : if the witness is charged with a design to misrepresent, on account of his changed relation to the parties or the cause, evidence of like statements before such change of relation may be admitted ; so, if it is attempted to be shown, that the evidence is a recent fabrication, or when long silence concerning an injury is construed against the injured party, as in cases of an indictment for rape, in such cases it is proper to show, that the witness made similar statements soon after the transaction in question.

3. —— exceptions to the rule.

This rule is well settled in England, and, though there are cases holding a conflicting doctrine, yet it appears to be supported by the greater weight of authority in the American decisions. 1 Starkie's Ev. 187 ; 1 Greenleaf's Ev. § 469 ; 2 Phillips' Ev. (Cowen & Hill's and Edwards' notes), 978 ; *Gibbs* v. *Linsley*, 13 Verm. 208 ; *Reed* v. *Spaulding*, 42 (N. H.) 114 ; *Smith* v. *Stickney*, 17 Barb. 489.

*The State* v. *Rorabacher* (19 Iowa, 154), cited by the prisoner's counsel, in support of the doctrine for which they contend, recognizes no principle bearing upon it, and *The State* v. *Cruise* (id. 312) is not by any means in point. In the last mentioned case evidence of a statement of the witness, made before the crime was committed, of a circumstance happening before the offense, is held competent, on the ground, that as it was utterly impossible for the witness to foresee the event which he narrated, and thus manufacture evidence in support of his credibility ; and because the time of the happening of that event was in dispute, the fact that the witness did narrate the circumstance, should have been admitted in evidence

to corroborate him. Thus evidence of the witness' statement was held admissible, not to sustain his credibility, but as an independent circumstance tending to corroborate his statement as to the time a certain event happened.

III. The prisoner offered to prove by a witness produced in court, that the deceased, before he left home, informed the witness that he intended soon to leave, and when he left he would never make himself known, or be heard from by his family. The introduction of this evidence was not permitted by the court, which is assigned for error. We know of no rule under which it is admissible, and no authorities are cited or reasons given to sustain its competency.

4. —— criminal law: declarations of deceased.

IV. At the time the remains of the murdered man were found, the head had been severed from the body, and was by a physician preserved in alcohol. It was exhibited to the court and jury at the trial. Many witnesses for the State identified the head as that of Claiborn Showers. The greater portion of them recognized it by the features alone; others, in addition, discovered peculiar marks upon the teeth, which seemed to increase their confidence in its identity. The prisoner proposed to prove, by two witnesses, who were physicians and surgeons, and whose knowledge and attainments in their profession made them familiar with the natural changes through which a human body must necessarily pass after death, that, on account of such natural and inevitable changes, it was not possible for any one to identify the head. The court refused to permit the evidence to go to the jury.

5. —— medical testimony: conclusions not admissible.

The rule, which admits in evidence the opinions of persons of learning and skill on questions of science and art, has never been extended so far as to admit testimony of this character.

It would have been competent for the witnesses to

have stated the character and nature of the change in the human body, produced by death within certain periods of time, and to have explained or illustrated to what extent these changes had operated upon the head of the deceased; and to have stated their usual and necessary effect according to the laws of nature. The progress of decay, the distortion and discoloration of the features, and the consequent change or destruction of the peculiar expression of the countenance, by which human faces are usually distinguished and identified, as shown by the head in question, would have been proper facts for the witnesses to have pointed out and explained to the jury. When so instructed the jury could have determined, and it was for them alone to determine, whether it was possible for those knowing the deceased in life to identify the head. The witnesses were expected to state their opinion as to a fact which was a conclusion from other facts. Now, while the facts upon which they based their opinion may have been peculiarly within their knowledge as scientific men, namely, the natural change and decay of a dead body, yet the conclusion — the consequent fact — the possibility of identifying the head — they were no more capable of determining than those not learned in anatomy and chemistry. It may be probable, that the evidence of these witnesses on the question of identity, they having known deceased in life, or having before them a picture admitted to be correct, or in any other way made familiar with the features of deceased, would be of greater weight than that of those who have not made the human body a study. In a case involving the genuineness of a signature, an expert may be allowed to give his opinion concerning it. Upon evidence of this character forgeries are often established. But an expert, in such a case, would not be permitted to state an opinion, that the signature could or could not have been made by

the accused or the person denying it, or that others could or could not detect its real character; but he might state facts and point out characteristics from which the jury could be justified in drawing such conclusions.

The admission of the evidence of the physicians, as offered by the prisoner, was properly refused by the court.

V. One of the defenses made by the prisoner, is, that the body of the deceased is not that of Claiborn Showers, 6. — burden and that after it was found, he was in life, of proof: *alibi.* and was seen by four witnesses at different times and places. This defense is termed an "*alibi* of the alleged deceased" in the instructions of the court and argument of the counsel, and the jury were instructed that, to sustain it, the same weight of evidence was necessary as to sustain the *alibi* of the prisoner, which was also a defense, and that the burden of proof of each was upon the prisoner. This, it is urged, is error.

The *alibi* of the prisoner, and the existence in life of Claiborn Showers at the time of the alleged murder, are each independent propositions totally inconsistent with the guilt of the prisoner. It is evident the burden of proof of each rests upon the prisoner, for neither, against *prima facie* evidence of its corresponding inconsistent proposition of the prosecution, will be presumed. These defenses, then, must be sustained by the prisoner, and the evidence necessary to sustain either of them must be sufficient to outweigh the proof tending to establish its contradictory hypothesis.

This is the doctrine of the instructions objected to, and it is sustained by reason and the authorities.

VI. It is urged, that the verdict of the jury is not sustained by the evidence. Upon a careful consideration of the whole evidence, and a comparison of facts and circumstances proven by the witnesses for the defense, as

The State v. Vincent.

well as the State, we are not prepared to hold, that the verdict is not sustained by the evidence. We have given to the evidence most patient and protracted study, and the more familiar we become with it, the stronger become our convictions of the justice of the verdict.

VII. As we are by law required to do, we have given a careful examination to the whole record, and considered not only the points assigned for error and argued by the prisoner's counsel, but all others upon which it appears that questions may be made, and have found no error.

VIII. It is urged, that the sentence is extreme, and we are asked to reduce the term of imprisonment. The verdict was doubtless based upon a presumption in favor of the prisoner indulged by the jury, that the crime was committed under circumstances which would reduce its character to manslaughter. This presumption is hardly justified by the facts of the case.

The mutilated condition of the remains when found, the head being severed from the body; the extraordinary care of the prisoner, successful in a measure, to conceal all evidence of his crime; his appropriation of the horses and other property taken by him from the deceased as his own, and selling them as such, — these and other facts are hardly consistent with a condition of mind and heart of the prisoner, at the time of the crime, which reduces it to the low degree of felonious homicide for which he stands convicted, and are not calculated to recommend him to the mercy of the court.

The judgment of the District Court is affirmed.

Affirmed.