Dissenting Opinion.
I.
Watkins, J.
The first objection, I think well taken by defendant’s counsel, is that which relates to the admissibility of the *1001 testimony of Henry Lochte. It was offered on the part of the State for the avowed purpose of confirming the truthfulness and general veracity of one Charles Sherman, the only witness by whom the 'corpus delicti was proven. This testimony was offered in rebuttal, after the close of the defendant’s evidence; and by it, the State proposed to show that Sherman had made to him, Lochte, on several occasions prior to the defendant’s commission of the crime charged, similar statements to those he had made in the course of his examination in chief as a witness.
To this testimony the defendant’s counsel objected on the following grounds, viz.:
1. That the witness’ testimony did not tend to corroborate the veracity of Sherman; and that for that purpose it was incompetent, immaterial and inadmissible.
2. That it was hearsay, irrelevent, and made out of the presence and hearing of the defendant.
3. That it was inadmissible for the purpose of sustaining and confirming the truthfulness of Sherman, because it does not tend to confirm his testimony upon a point material to the issue, in the sense that it tends to prove the guilt of the accused, or to connect him with the commission of the crime charged.
4. That the testimony of Sherman proves that be is an accomplice of the accused.
These objections having been overruled, and the testimony permitted to go to the jury, the counsel for the defendant excepted and reserved a bill of exceptions.
The judge assigned as his reasons for admitting the testimony: (1) That it was competent for the State to establish by the testimony of a disinterested third person that Sherman had told him that the defendant had agreed to obtain for him a barroom privilege for one hundred dollars; (2) that the statement of Sherman to Lochte was made 'four days previous to the alleged crime — at a time not suspicious; (3) that improper motive, recent fabrication and prevarication were imputed to the witness, Sherman, on the trial of the case; (4) that the evidence adduced showed, at most, that he was only a feigned accomplice; (5) that, in his opinion, it was competent to show by the witness, Lochte, that Sherman had stated to him that the defendant had proposed to be bribed in the manner by him related as a witness, several days prior to his actual com *1002 mission of the crime charged — in'other words, to show by the witness, Lochte, that Sherman had made a prior similar statement to him before the existence of his imputed purpose to'misrepreseut.
The purport of the judge’s ruling is, that the witness, Sherman, was not a guilty, but a feigned accomplice, uninfluenced by any criminal intent, in so far as any participation'in the crime was concerned. That improper motive, recent fabrication and prevarication were imputed to him on the trial, and it was competent to show, by a disinterested third party, that he made a prior similar statement at a time not suspicious.
The interrogation and responses of the witness, Lochte, are as follows:
Q. Was there any conversation at the time with reference to his (Sherman’s) petition for a license to operate a barroom?
A. Yes, sir.
Q,. What was it that passed between you in that conversation?
A. Mr. Sherman told me that Mr. Dudoussat wanted one hundred dollars to get him a permit to run a barroom at his place of business.
Q. Did you say anything to him?
A. I told him the proper place for that was for him to go before the grand jury.
Q. What was his answer?
A. He said that he would, but he wanted first to get his permit.
Q. That he would go, but that he wanted first to get his permit?
A. Yes.
The following is a portion of the interrogation and responses of Sherman in the course of his examination in chief, viz.:
Q,. What was this one bundred dollars given to him for?
A. To have him get my, barroom privilege, sir.
Q. Did you know what position he occupied?
A. Well, I could not say what his position was. I thought I would give him this one hundred dollars for the privilege for my barroom.
Q. Did you know whether he held any office?
A. Yes, sir; Mr. Dudoussat.
Q. What office did you know he held?
A. He was a council in the Oity Hall; a councilman.
Q. Did he make any promise with reference to your ordinance?
A. Yes, .several times.
*1003 Q,. What was it he promised to do?
A. That he would get me my barroom privilege.
Q. Did he require you to do anything for the passage of the ordinance?
A. Yes, sir.
Q. What?
A. He told me that if I gave him one hundred dollars it would be all right, and the privilege he would get.
Q. That was the reason you gave him the money?
A. Yes; and he said he would work for it.
Q,. He would work for what?
A. Work to get my barroom privilege from the council.
Q,. For one hundred dollars?
A. Yes, sir; and I paid him for it.
The foregoing is quoted from the examination in’chief of the’witness, Sherman, on the part of the State, and with this statement his examination was closed, and he was surrendered to the defendant’s counsel for cross-examination; and we make the following extracts therefrom, viz.:
Q. You know that place very well, the Jackson Brewery, don’t, you?
A. Yes, sir.
Q. How many times have you been there?
A. Four or five times.
Q,. For what?
A. To see Mr, Dudoussat.
Q,. When did you go there to see Mr. Dudoussat?
A. I can’t say.
Q,. Was it before or after the first petition was presented to the council?
A. Yes, sir.
Q. Before the first petition was presented?
A. Yes, sir.
Q,. Did you have any ice-box belonging to the Jackson Brewery?
A. Yes, sir.
Q. Didn’t you go there to see about that ice-box?
A. Yes, sir.
Q. How many times did you go there to see about the ice box?
A. I went there two or three times, because I was taking the *1004 word of Mr. Dudoussat that he was going to get my privilege, and at the same time to make a short cut about my ice box.
rf* tff «ft
Q. That was before you saw Mr. Dudoussat — before you saw him at all ?
A. No, sir; I saw Mr. Dudoussat before that, at my grocery.
Q- Before the first time that you went to the Jackson Brewery?
A. Yes, sir.
The witness, Sherman, then states all the circumstances of his visit to the Oity- Council for the purpose of seeing Mr. Dudoussat with regard to the passage of the city ordinance granting him a barroom privilege; and, also, the circumstances of the payment of the money to the defendant, stating that the plan was formed on the day before the payment, to entrap him, and capture him with the money in his possession.
On this state of facts, and at this stage of the trial, had the State a legal right to introduce Lochte as a witness, in rebuttal, and, by his testimony, seek to sustain the truthfulness of Sherman ?
That; must necessarily depend upon whether he was a guilty or a feigned accomplice; for, if a guilty accomplice, the rule of exclusion, which was recognized in the Callahan case, should prevail.
Lochte’s statement was “that Sherman told him that Mr. Dudoussat wanted one hundred dollars to get him a permit to run a barroom at his place of business;” and Sherman testified that Mr. Dudoussat “told him that if he gave him one hundred dollars it would be all right, and he would get his barroom privilege ? ”
It is apparent that this statement of Mr. Dudoussat to Sherman was competent testimony, but it is equally evident that the repetition of that statement by'Sherman to Lochte was the plainest kind •of hearsay, as the statemeat was made out of the presence and hearing of the defendant. It is equally evident that it constituted no part of the res gestee, because the conversation took place four days previous to Sherman’s alleged payment of the money to Mr. Dudoussat, and three days previous to the arrangement which is alleged to have been made to entrap him.
“Res gestee are events speaking for themselves, through the instinctive words and acts of participants, not the words and acts of participants narrating the events.
“ What is done or said by participants, under the immediate spur *1005 of the transaction, becomes thus part of the transaction, because, then it is the transaction that thus speaks. In. such case it is not necessary to examine as witnesses the persons who, as participators in the transaction, thus instinctively spoke or acted,” etc. (My italics.) Whar. Orim. Ev., Sec. 262.
“ The distinguishing feature of declarations of this class is, that they should be the necessary incidents of the litigated act, necessary in this sense, that they are part of] the immediate concomitants, or conditions of such act, and are not produced by the calculated policy of the actors. In other words, they must stand in immediate causal relation to the act, and become part either of the action immediately producing it, or of the action it immediately produces.” Ibid., Sec. 263.
But it is answered on the other side, that improper motive and recent fabrication of evidence against the defendant, and prevarication had been attributed to the witness, Sherman, on the trial of the case, and this entitled the State to sustain his character for veracity and truthfulness by introducing in rebuttal the testimony of a disinterested third person, to show that he (Sherman) had made to him a prior similar statement before the existence of his imputed purpose to misrepresent.
The defendant’s counsel invoke their objection that Sherman is the guilty accomplice of Dudoussat, and for that reason his truthfulness can not be sustained by any testimony which does not tend to confirm his statement upon a point material to the issue in a sense that it tends to prove the guilt of the accused. To this, the reply of the prosecution is that, as the judge assigns, “the evidence adduced showed, at most, that Sherman was a feigned accomplice,” and for that reason the rule applicable to sustaining the veracity of an ordinary witness applied.
Let me see, first, what that rule is:
What was the character of Sherman’s impeachment which rendered sustaining evidence necessary?
The trial judge states, in his reason for admitting the objected testimony of Lochte, “that improper motive, recent fabrication and prevarication were imputed to Sherman on the trial.”
Imputed to him, when and where?
By the testimony of Dudousat, as a witness in his own behalf. No other means of imputation are anywhere suggested. When Dudous *1006 ■sat went into Sherman’s grocery he went alone. No one other than he and Sherman participated in the transaction respecting the payment of the money. All of Sherman’s confederates were upstairs, in a place for observation. Consequently there was, in the nature of things, no one other than Dudoussat in a position to impute to Sherman a recent fabrication of this story.
Is it true, as matter of law, that defendant’s mere contradiction of Sherman’s story, authorizes the introduction of hearsay testimony to sustain the truthfulness of his statement?
If so, then the defendant occupies an unfortunate situation; for, if he stands mute in the presence of his accusers, the impression of guilt is created against him, and if he denys their accusations, hearsay evidence becomes admissible as proof of guilt, by indirection.
Mr. Wharton says that a mere conflict of testimony, however, will not justify the introduction of evidence to back up the witnesses’ statements thus conflicting. Nor can such testimony be received * * * merely upon proof of prior conflicting statements of the witnesses.” Whart. Orim. Ev., Sec. 491.
That statement is in keeping with the jurisprudence of the country on the subject. State vs. Ward, 49 Conn. 429; Starks vs. People, 5 Denio. 106; Johnson vs. State, 21 Ind. 329.
The rule of exclusion not only applies to hearsay, but to any evidence. It goes to the extent of rendering any sustaining evidence inadmissible under that state of case.
Mr. Wharton fully explains the rule thus, viz.:
“When a witness is assailed, on the ground that he narrated the facts differently on a former occasion, while on re-examination it is competent for him to give the circumstances under which the narration was made, it is ordinarily incompetent to sustain him, by proof, that on other occasions his statements were in harmony with .those made on the trial.” Ibid., Sec. 492.
But such is not the claim made in this case, but it is claimed “ that improper motive and recent fabrication and prevarication had been imputed to Sherman on the trial of the instant case. Let that be conceded, and what is the rule? On this question Mr. Wharton says: “On the other hand, when the opposing case is that the witness testified under corrupt motives, or where the impeaching evidence goes to charge the witness with a recent fabrication of his testimony, it is proper that such evidence be rebutted;” Ibid., Sec. 492.
*1007 But it must be observed, that the author does not say that such impeaching testimony can be rebutted by means of hearsay evidence, as the State was permitted to do in this case. The contrary appears clearly from the illustration he gives. That when a witness on the trial of a case of perjury was shown to have made a false statement as a witness on the previous trial of a case of arson, “it was held, that as he had been thus discredited he might be sustained by showing that he had made to C., immediately after the arson, a statement in harmony with that made by him on the perjury trial, though the particulars of the statement were inadmissible.” Ibid., Sec. 492.
So, the rule permits a witness thus attacked to be sustained by proof of the fact that he had previously made “ a statement in harmony ” with his statement on the trial; but it excludes “the particulars of the statement,” as wholly inadmissible.
To this effect is the statement of many decisions and text writers. Taylor’s Evidence, Sec. 1330; 2 Phillips’ Evidence, Sec. 445; 1 Starke’s Evidence, 253; 3 Russell on Crimes, 593; Henderson & Jones, S. and R., 410; Cook vs. Curtis, 6 H. & J. 86; Solp vs. Blair, 68 Ill. 453; Coffin vs. Anderson, 4 Blackf. 395; State vs. Vincent, 24 Iowa, 570; State vs. George, 8 Iredel, 324; March vs. Hassel, 1 Jones, 329; People vs. Doyell, 48 Cal., 85.
Indeed, I am not aware of any well considered case in which this rule has been extended.
This question has been examined, and the rule, as announced by Mr. Wharton, maintained by this court.
In State vs. Guillory, 47 An. 31, quite a similar case was presented, and hearsay evidence was held inadmissible, for the purpose of sustaining the veracity of a State’s witness, whose testimony has been impeached; and this court said that the reasons of the trial judge were “insufficient to justify this radical departure from elementary principles, in permitting the introduction of hearsay evidence.”
The question was dislinctly affirmed in State vs. Callahan, 47 An. 455.
So much for the admissibility of hearsay evidence to sustain the credibility of Sherman, as an ordinary witness. But defendant’s counsel insist that he was a guilty accomplice, and that the rule of exclusion adopted in the Oallahan case should be applied; while on the other hand it is insisted that he was only a feigned accomplice.
The discussion of this question resolves itself into two proposi *1008 tions, (1) that, whether Sherman was a guilty or a feigned accomplice, was a question of fact for the jury to decide after hearing all the evidence, and not one of law for the court; (2) that, if it be one of law, primarily, for thejcourt to decide, the record and the testimony that is annexed to the bill of exceptions demonstrate that Sherman really sustained the relation of a guilty accomplice to the accused, and that the judge committed error in admitting the evidence of Lochte to sustain?his veracity as such.
(a) That it is a question of fact, the judge’s assignment of reasons attest, for it relates that “ the evidence adduced showed, at most, that Sherman was a feigned accomplice” — showing that he predicated his ruling on evidence adduced at the trial.
I am not aware of any opinion of this 'court in which this question has been decided, henee I will [refer to,[the decisions of other courts as controlling the question in dispute.
In State vs. McKean, 36 Iowa, 343, a question arose in reference to the following charge to the jury, viz.:
“If, at the time of taking the horse, he was actuated by or possessed of such felonious intent, he was then to be regarded as an accomplice; but, on the other hand,[if you are satisfied from the evidence that Meeks intended from the beginning to act the part of the detective, to ferret out and make ¡known the crime and secret frauds of the defendant and others, then he is not to be regarded as an accomplice.
“ The question of whether Meeks was an accomplice or a detective is important, and must be by you determined. * * *
“It is a question of fact which you are to determine from the evidence.”
After making a careful examination of the authorities, the Iowa court said:
“ We do not see how we can interfere[with either the action of the court or jury.”
The court cited inter alios Rex vs. Despard, 28 Howell’s State Trials, 346, in which Lord Ellenborough, in summing up, said:
“ But there is another class of persons which can not properly be considered as coming within the description, or as partaking of the criminal contamination of witnesses; I mean persons entering into communication with the conspirators, with the original purpose of discovering their secret designs, and disclosing them for the benefit *1009 of the public. The existence of such original purpose on their part is best evidenced by conduct which precludes them from ever wavering, or in swerving from the discharge of their duty, if they might be otherwise disposed to do so.”
The authority of this last case appears to have been generally accepted; and it is recognized as having correctly stated the principal distinction between the guilty and feigned accomplice, as it has been repeatedly quoted approvingly by text writers. 1 Phillips on Evidence, p. 118; 1 Greenleaf on Evidence, Sec. 382.
The principles of the foregoing decisions have been followed with practical unanimity in the following eases, viz.: Commonwealth vs. Downing, 4 Gray, 29; Commonwealth vs. Willard, 22 Pickering, 476; Commonwealth vs. Wood, 11 Gray, 85; Commonwealth vs. Boynton, 116 Mass. 343; People vs. Smith, 28 Hun. (N. Y.) 626; Campbell vs. Commonwealth, 84 Penn. St. 187; Haughton vs. State, 36 Ala. 236; Smith vs. State, 37 Ala. 472; Wright vs. State, 7 Texas Ap. 574; People vs. Bolanger, 71 Cal. 19.
Sanctioning this principle Mr. Wharton states the rule thus briefly and comprehensively, viz.:
“ Accompliceship is to be proved inferentially; the question is one of fact for the jury.” Whar. Crim. Ev. Sec. 440; Commonwealth vs. Elliott, 110 Mass. 89; State vs. Schlagel, 19 Ind. 169.
On this citation of authority, it can with safety be affirmed, that whether Sherman was a guilty or a feigned accomplice was a question of fact for the jury to decide after hearing all the evidence, and not one of law for the court.
This is not denied, but on the contrary, affirmed by counsel for the State, as the following quotation from their brief will show:
“ Whether Sherman was a feigned or whether he was a guilty accomplice, is not a question of law to be determined by the judge from an inspection of the pleadings, but one of fact to be found by the jury from the evidence.”
“The character and relation of the witness, Sherman, to the case, can not arbitrarily be fixed and determined by the allegations in the indictment; they must depend entirely upon the proof. It is not what the State avers, but what the evidence establishes that must determine the true condition of affairs.”
Such being the character of the issue tendered, it was not competent for the trial judge to consider and decide this question of fact, *1010 which properly belonged to the jury; and it is equally evident that this court can not undertake to consider and determine the question presented as one of law, in the face of all the authorities to the contrary. If this court were to undertake to decide, it would be compelled to seggregate from the case and decide in advance of the verdict of the jury, a question of i act which was their exclusive province to decide. By thus deciding, the verdict of the jury would have been forestalled. This action of the trial judge resulted in giving to Sherman the status of a feigned accomplice before the case had been submitted to the jury.
The appellate jurisdiction of this court, in criminal matters, is restricted to questions of law alone. Const., Art. 81.
Therefore, we have not the constitutional power or authority to take from the jury and decide any question of fact of which they are rightfully judges.
That this was the effect of the trial judge’s ruling, will appear from the brief of counsel for the State, thus:
“ This constituted Sherman a feigned accomplice, not a real accomplice, and he was to be treated as an ordinary witness, as to whom it might be shown that he had made a prior statement similar to the one charged to have been made from a design to misrepresent.”
Since State vs. Nelson, 32 An. 842, the constitutional power of this court to examine certain facts adduced on the trial, for the purpose of deciding questions of law thereon raised, has never been questioned.
For instance, testimony adduced after verdict, on a motion for a new trial. That adduced during the progress of. the trial, for the purpose of showing the admissibility of dying declarations. That offered for the purpose of establishing the overt act, justifying the admission of proof of bad and dangerous character of the deceased.
But the jurisdiction of this court, in this respect, is limited to the consideration of evidence which is admitted in the hearing of the judge alone, and out of the presence of the jury; and same must be confined to abstract, legal questions, which are not to be submitted to and decided by the jury.
This question was again very thoroughly examined in State vs. Sieley, 41 An. 143, and in the course of our opinion we said that this court “ has indisputable jurisdiction to examine and weigh the testi *1011 mony of witnesses, in the consideration and decision of questions of law growing out of the principal issue in the case, and which .are not submitted, to the jury " (p. 145).
At the time these decisions were rendered, the opinion was regarded by some in the light of an innovation upon the constitutional prerogative of this court; and in no case has that latitude been extended or enlarged.
The principles announced in the Nelson and Sieley cases were affirmed in State vs. Nash & Barnett, 45 An. 1137.
When the case last mentioned was again presented for our consideration, we were called upon to consider a certain ruling of the trial judge in which he employed this expression, viz.:
“ The rulings in these two cases” —State vs. Nelson, 32 An. 842 and State vs. Sielly, 41 An. 143— “ were made upon questions purely collateral to the main issue, upon the decision of which they had no bearing whatever. It did not require the court to go into an examination of any evidence touching the prosecution. * * * But when it proposed to extend this rule so as to embrace evidence going directly to the merits; to proceedings arising in the course of the trial before the jury," the judge said “ we may well call a halt.”
This ruling was approved by this court. State vs. Nash & Barnett, 45 An. 1137.
The evidence which the defendants were solicitous to have examined and passed upon by this court in that case related to an overt act of the deceased; laying a foundation for the introduction of uncommunicated threats, and making proof of the violent and quarrelsome character of the deceased.
Obviously that decision did not enlarge the principles of the Nelson and Seily cases; but its direct and immediate effect was to restrict the same within a slightly narrower compass.
As it was a question of fact for the jury to decide, after hearing and considering all the testimony adduced, whether Sherman was a guilty or a feigned accomplice, how could the trial judge do otherwise than a esort to a fair consideration of the whole evidence in deciding the same question? He could not stop short of this. If once decided by the judge, and upon the faith of his decision certain sustaining testimony was held admissible, what becomes of the question of fact for the jury to decide.
Should the jury entertain a different view from that of the judge, *1012 and decide that Sherman was a guilty accomplice, certainly the testimony of Lochte was altogether illegal and inadmissible. Therefore, the jury would.be placed in the dilemma of feeling constrained to believe that Sherman was a guilty accomplice, and, at the same time, to convict Dudoussat on the hearsay statements of Lochte, sustaining his veracity as a feigned accomplice.
Can a ruling be sustained which will produce such absurd consequences? Surely not.
(6) Does the record and the emasculated portions of the evidence appended to the bill of exceptions disclose Sherman to have been a guilty or a feigned accomplice? Let us look at the record and testimony from this standpoint.
In the statute under which the defendant is being prosecuted, the giver and receiver of a bribe are equally within its denunciation.
That is equally so of the article of the Constitution, which the bribery statute closely follows. The charge of the information is, that the defendant did, feloniously and corruptly, receive a sum of one hundred dollars from one Charles Sherman as a bribe, present or reward; “ feloniously and corruptly given” to the defendant “ by the said Charles Sherman, with the felonious and corrupt intent on the part of the said Charles Sherman,” etc.
Sherman, as a witness for the prosecution, states that he gave to the defendant one hundred dollars “to have him get (for him) a barroom privilege.” That the defendant promised him several times to secure the passage of a city ordinance granting him the privilege. It was for that reason he gave defendant the money.
In the course of his cross-examination he stated that he had visited the Jackson Brewery, where the defendant was employed, four or five times to see him. That this was before the ordinance had been introduced, and that he had gone there to see him about it. Said he had gone several times to. the brewery, “ because he was taking the word of Mr. Dudoussat that he wa3 going to get his privilege for him.” That he had seen the defendant on the subject, at his grocery, before he had seen him at the brewery.
Lochte testifies that he met Sherman, and had an interview with him, at his own place of business, four days prior to the giving of the bribe; and that, on that occasion, Sherman said the defendant-wanted one hundred dollars for securing for him a barroom privilege; and he, Lochte, told him that he ought to take the matter before the grand jury.
*1013 That Sherman said “he would go, but that he wanted first to get his permit.”
All of this is evidence, furnished by the prosecution, out of the mouths of State witnesses.
After all the witnesaes had testified, and the case had been submitted do the jury, the judge charged the jury that “the State must establish 'that, while said petition was pending for consideration and action before said council, the said defendant, a member of the council, and a municipal officer, in his capacity, feloniously and corruptly received a certain sum of money, viz.: one hundred dollars, from said Charles Sherman, as a bribe, present and reward, which was feloniously and corruptly given.to him by said Sherman.”
All of these dealings and conversations took place some days— many of them several weeks — prior to the date defendant is alleged to have received the bribe. Thoughout these transactsons Sherman was confessedly endeavoring to secure for himself a barroom pi'ivilege by means of a corrupt bargain with the defendant. He went to the defendant’s place of business to solicit and perfect their negotiations to that end, and defendant went to his grocery to see him on the subject before the ordinance was introduced.
In his conversation with his friend Lochte, the dialogue is both unique and significant. Lochte said to Sherman:
A. I told him the proper place for that was for him to go before the grand jury.
Q,. What was his answer?
A. He said he would, but he wanted first to get his permit.
Q,. That he would go, but he wanted first to get his permit?
A. Yes. (My italics).
It must be remembered that the agreement that is alleged to have been made between Sherman and his confederates, to concoct a' plan for the defendant’s capture with the bribe in his possession, was only formed on the day previous to the commission of the crime;. and that all of the transactions related preceded it, days, and even weeks.
Is it not apparent that all of Sherman’s acts, prior to this confederation, were those of solicitation and inducement, and that the definite, well defined and confessed object in view, on his part, was only to secure his barroom privilege?
Having, as he supposed, succeeded in procuring that, he entered into the conspiracy to secure his arrest, as an afterthought, possibly inspired by others — albeit for a praiseworthy object.
*1014 The Iowa court deemed it essential that the jury should be satisfied from the evidence that ‘ ‘ the witness intended from, the beginning to act the part of the detective.” State vs. McKean, supra.
And Lord Ellenborough, in Rex vs. Despard, supra, laid stress on a like proposition, and said: “I mean persons entering into communication with the conspirators with the original purpose of discovering the secret designs of the defendants, and of disclosing them for the benefit of the public.”
Does the foregoing statement from the pleadings and evidence make is clear that Sherman “ intended, from the beginning, to act the part of the detective?” Does it show that it was his origina “purpose” to discover the fraud and crime of Dudoussat, and expose him,, for the benefit of the public?
Both of these questions must be answered in the negative, if the evidence is to be regarded.
Mr. Bishop says: “ An accomplice is one who has become a partaker with others in a crime, whether his guilt is in the same degree with others or not. It must be legal guilt, a participation reprehensible in morals only, or only colorable, is not sufficient.” 1 Bishop Crim. Prac., Secs. 1173, 1159; 4 Blackstone’s Com. 34, 331; 1 Russell on Crimes, 26. That he further says:
“ One who has connected himself with the offence in a way morally corrupt, while yet he is not indictable, is, as a witness, subject, in part, to the same observation as an accomplice, but not fully,” his testimony requiring confirmation. Ibid.
To my mind, it is a clear conviction that Sherman was, to all intents and purposes, a guilty accomplice, and should have been so treated and considered by the trial judge; and that, consequently, the admission of the testimony of Lochte was reversable error.
II.
Pertinent to the foregoing inquiry is one of the special charges which defendant’s counsel requested the trial judge to give, and to his refusal to give same a bill of exceptions was retained.
It was that if the jury find from the evidence that Sherman was a guilty accomplice, the corroborative evidence should, at least, have a tendency to connect the accused with the commission of the crime charged.
This instruction was refused by the trial judge for the reason, viz.:
*1015 “ In my opinion, Sherman was not an accomplice. * * * Ire-fused to so charge the jury, because the point did not arise in the case, and the charge was not applicable to the facts in evidence.”
It is evident that the judge was in error in making this statement from what has been found in the preceding paragraph.
The only way in which his two rulings can be harmonized is to view the question as to whether Sherman was a guilty or a feigned accomplice as having been by the judge entirely withdrawn from the consideration of the jury, and solely resting on the foregoing bill of exceptions. This, in the light of all the authorities, he was not competent to do.
III.
The next bill of exceptions to which my attention is attracted relates to another special charge which was requested by counsel, and refused by the court, viz.:
“ It is incumbent on the part of the prosecution to prove to the satisfaction of the jury, beyond a reasonable doubt, that Charles Sherman did feloniously and corruptly give to the accused, Numa Dudoussat, the sum of one hundred dollars, as a bribe, present, or reward, with the felonious and corrupt intent on the part of Charles Sherman,” etc.
This request was refused by the trial judge, for reasons already assigned in other bills. This bill is the counterpart of the last two; but it has a different object. That object was, evidently, to obtain from the judge an explanation of what is an apparent conflict between two different paragraphs of his written charge to the jury, one of which is to the effect that “ the State must establish beyond a reasonable doubt * * * that the defendant * * * feloniously and corruptly received a certain sum of money * * * from Charles Sherman, as a bribe, present and reward, which was corruptly given to him by said Sherman,” and the other was to the effect that “ the defendant is chargeable with the crime of receiving a bribe, whether the giver of the bribe acted himself merely with a view to secure the detection and conviction of the accused, or otherwise.”
It is evident that these two instructions are inconsistent, irreconcilable, and confusing.
I think the jury should have had the conflict explained; and justice to the defendant required it.
*1016 IV.
The next bill relates to the defendant’s application for a new trial. The motion assigned fourteen grounds, but the purposes of this dissent only require notice of but one, and that is the eleventh, viz.:
“ That the written charges and instructions of this honorable court, to the said jury, were inconsistent, conflicting and contradictory, and calculated to confuse and perplex them,” reciting in full the two paragraphs from the written charge, from which the foregoing quotations are made.
But, while the trial judge, in his assignment of the reasons for refusing to grant defendant a new trial, elaborately discussed other grounds of the motion, he omitted altogether this one from any con - sideration. It is not mentioned at all.
Counsel for the State say in their brief, viz.:
“The objection that the charge contained contradictory statements was not interposed at the trial. No opportunity was afforded the trial judge to correct a mistake which was unmistakably due to inadvertence,” etc.
This statement admits that the two quoted paragraphs from the charge were “ contradictory statements,” and that same were “ unmistabably due ” to inadvertence on the part of the trial judge.
But the preceding paragraph of this dissent shows clearly the counsel’s error in stating that these “contradictory statements” were not mooted at the trial. They are quoted and referred to in that bill.
The general charge which contained these two conflicting and ‘ ‘contradictory statements,” was in writing, and filed in the record on the 3d of December, 1894; and the defendant’s requested special charges being also in writing, were handed to the judge, and as the minutes of the court disclose, he kept them under consideration until the following day, when they were severally refused and filed in the record.
This occurred, of course, before the ease was given to the jury for their deliberation.
Manifestly, the trial judge had ample time, as well as opportunity, to inform himself in the premises, and he should have, in some proper way, made an explanation of these “contradictory state *1017 ments” in his general charge before the jury retired. To his declination a bill was reserved.
After the defendant’s conviction, a motion for a new trial was his only alternative relief; and, in onr opinion, that relief should have been afforded. Refusing it was relievable error.
I have gone over this case very carefully, and patiently investigated the record, as well as the authorities, as I try to do in every case, and I arise from my study of the matter with the settled conviction that the defendant should have a new trial, because his conviction rests exclusively upon the testimony of Sherman, who is a guilty accomplice, sustained alone by the hearsay statement of Loehte, merely reiterating a statement Sherman had made to him four days previous to the alleged bribery and out of the presence and hearing of the defendant.
For these reasons I feel constrained to dissent from the opinion and decree of the majority.