THE STATE, DEFENDANT IN ERROR, v. WILLIAM H. STRONG, PLAINTIFF IN ERROR.

Argued November 13, 1911—Decided June 4, 1912.

Where, in a criminal case, a specimen or exhibit contains more than one mark or external appearance relevant to the issue being tried, a part only of such specimen or exhibit, containing but one of such marks, selected for the purpose, by the party offering it, is not admissible.

On error to the Atlantic County Oyer and Terminer.

William H. Strong, indicted for the murder of his wife, Mary H. Strong, at their home near Nesco, in Atlantic county, on October 14th, 1910, was convicted of murder in the second degree, and sentenced to confinement in the state prison for

a term of thirty years. He has brought this writ of error to review the conviction.

The important facts disclosed upon the trial may be stated thus: The defendant, about four o'clock in the afternoon of October 14th, 1910, went to a neighbor's house about three hundred yards away and announced that his wife had been murdered by being struck with a hoe. He also immediately thereafter reported the fact to two or three other neighbors, who then returned with the defendant to his home and there in one of the stalls in a shed or stable found Mrs. Strong lying dead. Her face had been battered into an unrecognizable mass, her head was in a pool of blood and the manger was spattered with blood. She was lying with her arms folded over her heart, her limbs close together and her dress and underclothing partly between her legs. A superficial examination made that evening disclosed abrasions and bruises on the vagina. The undertaker, who arrived a little before six o'clock, found the blood on the face had then hardened, from which he concluded that she had then been dead from three to four hours. The burial took place some three days thereafter, without an autopsy. The theory, at that time, seems to have been that the crime had been committed in an attempt at rape. On November 1st, the body was exhumed for the purpose of performing an autopsy, and there was found on the front part of the neck three markings, one on the right side, two on the left, in the opinion of the medical expert, produced by fingers. There was opinion evidence given at the trial that choking was the cause of death, that it had preceded the mutilation of the face, and that death had ensued approximately three hours after a meal.

The defendant and his wife had dinner together at their home, on the day of the murder, about noon, and after it he left about twelve-thirty, with his horse and wagon in which were chickens and eggs which he intended to sell. He drove to Elwood, about five miles, and en route took a man into the wagon, who rode with him the rest of the way. The defendant stopped about a mile from Elwood, and there sold his produce, talked some moments and left about two-thirty,

driving back to Elwood, where he bought tobacco, hitching his horse, and going into the store to make the purchase. There was evidence that it was then about three o'clock, when he started on his return home, and that he reached there shortly before four o'clock.

It was not seriously controverted that Mr. Strong was absent from home from about twelve-thirty until nearly four o'clock. His home was in the woods in a sparsely settled region. He was sixty years of age, had been married in 1880, and had built the small house wherein the couple had lived for thirty-one years. They were childless. They had paid for their home by their united exertions and had a bank account of about $500 in their joint names.

Strong appears to have been illiterate, artless and credulous. He believed in mediums. On November 3d, 1910, he went to Atlantic City in order to consult a medium, to whom he had been recommended, to learn who had murdered his wife. He was accompanied by Mrs. Reed, an acquaintance and former neighbor, whom he had invited to go with him and to whom he had disclosed the object of his visit. They failed to get the desired information from the man to whom they first went, and then they proceeded to a woman, practicing her trade on the boardwalk, who gave "Crystal Readings" and requested a reading from her. The defendant thus details the occurrence: "I went in. I had Mrs. Reed with me. She (the medium) wanted to know who it was wanted the reading, her or I. Mrs. Reed spoke up and says: 'It is him; he would like to know his troubles,' and she says 'Anything concerning stolen goods, I can't tell,' and Mrs Reed said it wasn't stolen goods he wanted to know of his troubles other ways and she said, 'I think I can tell you.' Then she began after taking my house-key and rolling it in her hand, 'I see trees, I see there two buildings, it isn't in the kitchen, it is either into a closet or a pantry, and there there came a man that come up to her that had some words concerning quarreling, and then my wife grabbed him by the collar with her left hand and he grasped her by the throat, and by her being weak and nervous by the crushing of the throat, it overcame her

and her heart stopped beating. Then he picked her up and he carried her to this place and there he beat her with a hoe till there was nothing you could recognize of any part of her face. Her hands were crossed and she was laid out in a form as a person should be laid out. He started away and he washed and he had burned his garment. He is a great deal younger man than you, with brown hair, with a round face and broader across the chest.' "

Mrs. Reed and Pauline Elder, the medium, or clairvoyant, are in substantial accord in their testimony with that of the defendant concerning what took place at this interview. Madame Elder admitted that she had many weeks previous, when the murder happened, read a newspaper account of it; that she had not previous to the first interview seen the prosecutor, or the detectives, but stated that at the first interview, on November 3d, she saw it clairvoyantly, and was not speaking of what she had read. What she gave him in the reading, she told him clairvoyantly, and by this insight, she saw the murder, that the woman was choked to death in her dining-room and carried over to the barn by a man that looked like Mr. Strong, and that he there mutilated her face with a hoe.

After this first interview, on the 3d of November, Strong, on going away, said to Madame Elder, that if she found out anything new, she could write to him. He had, on the 1st day of November, told Baitzel, one of the detectives engaged on the case, that he intended going to Atlantic City on the following Thursday to consult a medium and ascertain if he could who it was that had committed the crime. On the morning of the third, on his way, he stopped at the prosecutor's office to see Baitzel, but not finding him there, he went to the reading, and afterward he returned to the prosecutor's office, in the afternoon, saw the prosecutor, made himself known and asked for Baitzel. Learning from the prosecutor that he was not there, he told the prosecutor that he had a woman who knew who committed the murder, who could describe what the man looks like and pulled a slip of paper from his pocket on which was written, "Madame Pauline,

Board Walk and Jersey Avenue," and related some of the things which she had told him that afternoon.

The prosecutor then made an arrangement with the so-called clairvoyant, had her write a letter to Strong, asking him to come again to her on the seventh, alone. The second interview took place as arranged.

Mr. Strong went to her upon the morning of that day, having previously prepared a series of questions which he wished her to answer. She took the questions and told him he must return in the afternoon, which he did. At the time appointed, in the afternoon, Detectives Baitzel and Guyer were concealed in an adjoining room where they could hear what occurred.

Before going to Elder's, on that same morning, November 7th, the defendant met Baitzel in Atlantic City and said to him, "I am glad to see you. I am going down to see the fortune teller and I would like you to go with me." Baitzel said, "No." At the second interview was obtained the alleged confession, without which it may be stated there is slight, if any, evidence of the defendant's guilt. Whatever other acts or words proceeded from Strong seem as consistent with his innocence as with his guilt. He was arrested the next morning, and had a hearing on the 27th of November.

At the second interview, after answering the questions which Strong had propounded, in writing, the clairvoyant said, "Let us go over this case and talk about it." She then commenced, according to her own evidence, "Well, Mr Strong, you came here to-day to have a talk with me simply. You said you knew that I had something else that I could tell you in regards to this affair, in fact, that I could tell you who the murderer of your wife was; and I said, 'Yes, I can tell you that,' but I said, before we go that far let us talk about the case. I talked to him about how good his wife had been and I said how you had even nagged her and ill-treated her many times in the years she has been married to you through the awful temper you have. He said, 'Yes, I know I have a terrible temper.' I said, 'You know how hard she has always worked for you,'

and he said, "Yes, I know it,' and I said, 'Now, Mr. Strong, you have something on your mind. You have had it on your mind since the day your wife was murdered. You know you have not had any peace of mind.' He said, 'No, I haven't had any peace of mind.' 'Your wife would like you to relieve your mind of the awful burden you have.' He said, 'What shall I do, what does she want me to do?', I said, 'She wants you to tell the truth and nothing else only the truth.' He wrung his hands for a moment or two. 'What must I do? What must I do?' he kept saying. I said, 'You must not do anything but tell the absolute truth.' I said, 'You asked me if I could tell you who murdered your wife, I will tell you what the man looked like. Yes, the man, Mr. Strong, looked exactly like you look.' He said, 'That means then I killed my wife?' I said, 'Yes, that means that you killed your wife, you murdered your wife in an awful manner.' He shook his head that way, nodded it several times. I said, 'Mr. Strong, don't shake your head, don't nod your head that way, say yes or talk about it,' and he said, 'Yes, I killed my wife.' With that he began to groan and moan and seemed to be nauseated and the perspiration poured off him and dropped from the side of his hair on his coat collar. I saw that he was slipping off the chair. I got up from my chair and said, 'Mr. Strong, be careful, you will slip off your chair.' He said, 'Oh, help me.' And I assisted him to a rocker and he put his feet upon the chair he had been sitting on. I sat down again and kept on talking to him. 'Now, that you have relieved your mind of the awful burden, tell me what happened.' He said, 'Let me think for a moment. It is so awful, I can hardly think.' In a moment he got cool and collected and he began to talk."

Then follow in detail answers alleged to have been made by Strong to questions put by her to him, or suggestions made by her, in which she and the detectives say that the defendant not only admitted having committed the murder, but in detail described it. The defendant denies it, and charges that he became faint at the time he fell from his

chair, that he became ill and his mind dulled, and that something was given by the medium to him to drink. She admits that she gave him water.

Before GUMMERE, CHIEF JUSTICE, and Justices SWAYZE and VOORHEES.

For the plaintiff in error, *Carrow & Kraft* and *Wescott & Wescott.*

For the state, *Clarence L. Goldenberg,* prosecutor of the pleas.

The opinion of the court was delivered by

VOORHEES, J. With this writ the defendant has not caused to be returned the entire record of the proceedings had upon the trial, pursuant to section 136 of the Criminal Procedure act. *Comp. Stat., p.* 1863.

Our consideration of the case must therefore be confined to the questions raised by the strict bill of exceptions.

It appeared that upon a superficial examination of the body of the deceased made on the day of the murder by the coroner, who is a physician, that bruises or abrasions of a bright red color were discovered upon her genital organs. It also appeared that the face had been mutilated beyond recognition. The body had been buried some three days after the death, and, on November 1st, some fifteen days thereafter, had been exhumed, and an autopsy then first performed. An examination was then also made by means of a swab to determine whether spermatozoa were present, in order to ascertain whether the woman had been raped.

The physician performing this operation, not the coroner, testified upon the trial that "there were markings upon each side of the neck which in my opinion were produced by the fingers." This force, he said, had constricted or pressed upon the parts in a manner to produce, before death, certain signs and markings which, from his experience, are found in suffocation, and gave it as his opinion that death was caused by

throttling.    He further said he found no spermatozoa or semen on her drawers, and that the injuries to the face were produced after death.

The following testimony appears:

Question by the prosecutor—

"*Q.* Did you remove any part of the body of Mary Strong?

"*A.* I removed some of the parts; yes, sir.

"*Q.* Have you a specimen at the present time of her body?

"*A.* Yes.

"*Q.* What part of her body?

"*A.* I have the neck, which shows the finger markings very plainly at the present time.

"Mr. Wescott—The state tells me they are going to produce a horrible picture here, the woman's neck.    We object to that.    We object to it, first upon a moral basis.    It is not necessary to do that.    Nobody questioning the fact that this witness has testified to, we do not want the degradation and moral sickening that must come from an exhibition of this sort.    On legal grounds we object to it because, if part of the body is to be shown, we want the whole of it.    The whole of the woman's body is just as important as any part of it, and the evidence already before your honor shows that that is so, and I think the state ought not to be permitted to cut off the head of this woman and bring it here before this jury.    If they are going to insist upon doing that, we think they must produce the whole body, otherwise we object to it.

"Mr. Schwinghammer—It is necessary for the state to prove that Mary Strong met her death by suffocation or throttling, among other things, to bear out the confession which Strong made, and the specimen is undoubtedly a proper exhibit to be brought before the court if there is reason shown for it.    Our reason we say is that the marks appear distinctly on the throat, showing the cause of death to have been by throttling and strangulation, and not by the chopping of the head.    First, I want to ask preliminary questions.    We are not offering it at the present time."

The specimen was the neck from the chin down.    The medical witness was then allowed to stand aside and oral

proof was given to show that since the time of death, no marks had been made upon that part of the body; that after exhumation it had been in the custody of the state's representatives, and that the marks upon the neck had been seen at the time of the coroner's inquest. The offer of the specimen was renewed, and again objected to, on the ground that the rest of the body was just as material, and that the whole body might disclose many circumstances and conditions which would throw light upon the case. The specimen was then admitted and an exception allowed and sealed.

That real, or, as it is sometimes called autoptical evidence, is a legitimate means of proof is well recognized. Professor Wigmore says, section 1151, "accordingly it might be asserted, *a priori*, that where the existence or the external quality, or condition of a material object are in issue or are relevant to the issue, the inspection of the thing itself, produced before the tribunal, is always proper, provided no specific reason of policy or privilege bears decidedly to the contrary."

That such evidence in criminal cases tends to produce an unfair prejudice against the accused is usually now denied by the court, although the production of repulsive objects may, in the discretion of the court, be excluded.

Our courts have recognized in a bastardy case the probative force of the resemblance of a child to its putative father (*Gaunt* v. *State,* 21 *Vroom* 490; *Commonwealth* v. *Brown,* 14 *Gray* 419), was an indictment for unlawful attempt to procure abortion. The court said: "The parts of the person upon whom instruments were alleged to have been used for the purpose of procuring an abortion, which had been preserved, were properly allowed to be submitted to the inspection of the jury in connection with the testimony of the physician who made the *post-mortem* examination." In the following cases, portions of the human body have been admitted in evidence: *State* v. *Vincent,* 24 *Iowa* 570; *State* v. *Wieners,* 66 *Mo.* 13; *State* v. *Murphy,* 118 *Id.* 7; *Savary* v. *State,* 62 *Neb.* 166; *Turner* v. *State,* 89 *Tenn.* 547.

But the objection in the case *sub judice* is much deeper. The body not only contained the marks upon the neck alluded to, but the face furnished evidence of mutilation. That this had been done after death had ensued by strangulation, had been asserted by the expert. Moreover, it was admitted that the sexual organs were injured, giving rise to the theory that death had been caused in an attempt to perpetrate rape. This was so plausible that an examination had been made to determine that fact, a fact which, if true, would be incompatible with the guilt of the husband of the deceased woman. So, it appeared that not only the neck, but the face as well as the private parts of the body, were each relevant to the issue being tried.

That strangulation caused death was necessary to sustain the alleged confession, and without such proof of the *corpus delicti,* the confession was bereft of evidential value. *State* v. *Guild,* 5 *Halst.* 163. But for the confession, the proof was entirely circumstantial, and in that posture of affairs, the marks upon the body, other than the neck, were important to the defendant to break the force of that character of evidence, by tending to show facts inconsistent with it. By the control which the state had over the body, it was put out of the power of the defendant to produce the other marks. The body was a single piece of evidence. If admissible, it was admissible as to all its parts, so far as any part supplied a piece of evidence.

As an instrument of evidence in this case, it should have been offered as an entirety, or at least none of the evidential parts should have been excluded, and one, only selected by the state to support its particular theory admitted in evidence. If the finger marks were evidential, so were the bruises and other marks, and especially did the latter make strongly for the innocence of the defendant whose perpetration of a sexual assault against his wife is unthinkable, and might have convinced the jury that the perpetrator, other than the husband, in seeking to gratify his passions, had choked his victim.

Where, in a criminal case, a specimen or exhibit contains more than one mark or external appearance relevant to the issue being tried, a part only of such specimen, or exhibit, containing but one of such marks selected for the purpose, by the party offering it, is not admissible. For this error, which we think was harmful to the defendant, there must be a reversal.

A series of photographs taken on November 25th were offered by the state, and over objection admitted in evidence. The prosecutor stated that they had been taken some time after the murder and after quite some changes had taken place. The objection proceeded upon the ground that they did not show conditions as they existed at the time of the murder and were misleading.

They were admitted for the purpose of showing the conditions as they existed on the day they were taken. There was no other proof. It was not shown what changes had taken place. Under such circumstances, they should have been excluded as irrelevant.

The learned trial judge had before him evidence of the voluntary character of the confession, and having decided upon it, preliminarily to admit it, we are not to review that question on error (*State* v. *Zeller,* 48 *Vroom* 619; *Manda* v. *City of Orange,* 53 *Id.* 686), as we might have done upon a rule to show cause.

Since the reversal of this conviction may lead to a retrial, we cannot forbear to characterize this confession and the circumstances under which it was obtained as suspicious. It was given to a woman who, under oath, stated that at her first interview, by supernatural power, she saw the occurrences attending the murder and the participation of the defendant in it. That she should have had such sight and knowledge is incredible. It is contrary to all human experience to account for her utterances on that occasion as detailed in the testimony of what took place at the time of the murder, if they did occur, unless she had been informed by word or reading it before that time. No proof was given whether she knew Strong when he first went to her. If she knew him, it

was easy for her to have "seen" the tragedy. Three days had then elapsed since the body had been exhumed and the autopsy had taken place. Moreover, she admitted that she had read of the murder at the time of its commission. Having claimed on the witness stand, her supernatural powers is quite enough to weaken the force of her testimony as to the confession made at the second prearranged interview. That she dominated the defendant in his admitted feeble condition, and put words in his mouth, by suggesting answers to her questions, seems apparent.

The judgment will be reversed and the record remitted, to the end that a *venire de novo* may issue.